FILED

2018 Apr-23  AM 09:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CATHERINE REGINA HARPER and SHANNON JONES, on behalf of themselves and those similarly situated, and JENNIFER ESSIG, <br><br> Plaintiffs, <br><br> v. <br><br> PROFESSIONAL PROBATION SERVICES, INC., THE CITY OF GARDENDALE, ALABAMA, a municipal corporation, and KENNETH GOMANY, in his official capacity as Judge of the Gardendale Municipal Court, <br><br> Defendants.[1] | Case No. **2:17-CV-1791-UJB-AKK** <br><br> **SECOND AMENDED COMPLAINT (Class Action)** <br><br> **Jury Trial Demanded** |

## I.    PRELIMINARY STATEMENT

1.     America's judicial system is premised on the assumption that justice should be achieved through objectivity and fairness.  But to do so, "justice must satisfy the *appearance* of justice,"[2] for, if the decision-maker appears biased, the integrity of the entire system is undercut.  This is why "[t]he Due Process Clause

---

[1] Plaintiff Harper dismissed her claims against the City of Gardendale, Alabama, and Kenneth Gomany.  Plaintiffs, however, maintain the listing of all Defendants from the original caption of this suit for the Clerk's ease of reference.

[2] *Offutt v. United States*, 348 U.S. 11, 14 (1954) (emphasis added).

entitles a person to an impartial and disinterested tribunal."[3]  Neutrality "preserves both the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done,' by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him."[4]

2.      Professional Probation Services, Inc. ("PPS") turned these foundational principles upside down.  Pursuant to a Contract for Probation Supervision and Rehabilitation Services ("Contract") entered with a former judge of the Gardendale Municipal Court ("the Municipal Court") 20 years ago, PPS used the Municipal Court as a cudgel to extract financial profit from those too poor to pay their fines and court costs.  The Municipal Court required any person who could not pay in full to be supervised on probation with PPS.  In turn, PPS exercised exclusive control over its supervisees, and PPS had a direct financial interest in every decision it made in its supervisees' cases.

3.      Pursuant to the Contract, PPS set all the terms of probation, without input from, and often in contradiction to, what had been ordered by the Municipal Court.  PPS ordered supervisees to pay PPS a monthly fee—typically $40—which was the sole source of PPS's revenue.  To maximize its revenue, PPS controlled the

---

[3] *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).
[4] *Id.* (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring)).

length of time supervisees were on probation, sometimes ordering a longer period than was authorized by the Municipal Court; extending the term of probation when persons fell behind on payments; and collecting its fee first when partial payments were made—all conduct which resulted in more money to PPS.  In some instances, PPS unilaterally increased a probationer's fine to extend the term of probation and increase PPS's ability to earn a profit.

4.      Although the Contract under which PPS ran this probation scheme prohibited PPS from charging any fees to those who are indigent, PPS systematically ignored individuals' requests to reduce payments or perform community service in lieu of payment and failed to facilitate asking the Municipal Court for such relief.  And when individuals could not afford to pay, PPS set more frequent "review" hearings in Municipal Court, where PPS informed the Municipal Court that the person had not paid or missed check-in appointments.  Often, these statements were either lies about the underlying conduct or failed to provide critical context, including that the person had told PPS about their inability to pay, had called ahead of the alleged missed appointment to reschedule, or was unable to attend due to circumstances beyond her control.

5.      These one-sided in-court statements by PPS typically resulted in an order of detention for a number of days, during which the detained person would not receive credit toward their outstanding fines, costs, or fees.  Instead, after their

release, the person would continue their supervision with PPS, still facing the ongoing obligation to pay PPS's monthly fees along with the associated threats for non-compliance.

6.  By prioritizing PPS's ability to collect additional revenue over individuals' successful completion of probation, PPS increased its revenue to the detriment of Plaintiffs Catherine Regina Harper, Shannon Jones, and Jennifer Essig (hereinafter collectively "Plaintiffs") and others similarly situated, who were under PPS supervision and subjected to this unlawful contractual scheme and PPS's practices arising therefrom.

7.  Plaintiffs, each of whom is indigent, could not fully pay the fines and court costs that the Municipal Court had assessed against them on their sentencing dates, and were therefore assigned to PPS probation to pay fines and costs owed to the Municipal Court.

8.  When Plaintiffs fell behind on payments, PPS required them to report weekly to the PPS office for "appointments," where they were only required to pay.

9.  Moreover, PPS applied all money Plaintiffs paid first to PPS's $40 monthly supervision fee.  PPS also refused to offer Plaintiffs viable alternatives to payment, such as fee waivers or community service, even as Plaintiffs repeatedly expressed difficulties or the inability to pay.

10.  In addition, PPS used the Municipal Court and the threat of jail

sanctions for contempt or probation violation to intimidate Plaintiffs into compliance and paying more than they could afford.  Plaintiffs were jailed based on PPS's false or inadequate representations to the Municipal Court that they were "noncompliant" with probation terms.

11.     After this lawsuit was originally filed in October 2017, Judge Kenneth Gomany ("Judge Gomany") of the Municipal Court ordered all persons previously sentenced to a term of probation supervised by PPS to cease reporting to PPS. Instead, these persons were instructed to pay all outstanding court debt by January 1, 2018, or appear in the Municipal Court to request a payment plan.  As a result of the court order, PPS sent the City and Municipal Court staff notice of its intent to terminate the Contract, and the contract terminated in November 2017.

12.     Through this Second Amended Complaint, Plaintiffs now seek to challenge PPS's policies and practices of privatized probation arising from the Contract by bringing two claims: *First*, Plaintiffs Harper and Jones, on behalf of themselves and other persons similarly situated and Plaintiff Essig, individually, claim that the Contract and PPS's enforcement thereof violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by creating a process that injected PPS's financial interest into its operation of probation, and in so doing, illegally and unconstitutionally undermined confidence that probation was conducted by PPS in a disinterested fashion (First Claim for Relief).  *Second*,

Plaintiffs, in their individual capacities, allege that PPS's use of probation to maximize generation of profit constituted an abuse of process under Alabama law (Second Claim for Relief).

13.     Plaintiffs Harper and Jones, on behalf of themselves and a class of similarly situated individuals, and Plaintiff Essig, individually, seek actual and punitive damages from Defendant PPS for injuries suffered due to PPS's unconstitutional conflict of interest under the First Claim, and Plaintiffs Harper, Jones, and Essig seek actual and punitive individual damages for PPS's abuse of process under state law under the Second Claim.

## II.    JURISDICTION AND VENUE

14.     The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state law cause of action asserted in this Complaint under 28 U.S.C. § 1367, because the state law claim is related to, and forms part of the same case or controversy as, the federal claim over which this Court has original jurisdiction.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## III.   PARTIES

### A. Plaintiffs

16.    Plaintiff Catherine Regina Harper ("Gina" or "Harper") is a resident of Jefferson County, Alabama.

17.    Plaintiff Shannon Jones ("Jones") is a resident of Jefferson County, Alabama.

18.    Plaintiff Jennifer Essig ("Essig") is a resident of Jefferson County, Alabama.

### B. Defendant

19.    Defendant Professional Probation Services, Inc. ("PPS") is a foreign corporation incorporated in Georgia.   Defendant PPS did business in Jefferson County, Alabama, during all times relevant to this action, providing "probation" services for the City and collecting probation fees for PPS as well as fines, restitution, and court costs for the Municipal Court, pursuant to the Contract.

## IV.   STATEMENT OF FACTS

### A. The City of Gardendale, Alabama, and its Municipal Court

20.    Gardendale is in Jefferson County, Alabama, north of Birmingham, Alabama.  It has a population of approximately 14,000 residents.

21.    The Gardendale Municipal Court (the "Municipal Court") is authorized to hear cases involving city ordinance violations, including traffic tickets and

misdemeanors, which occur within the city's police jurisdiction.

22.     The Municipal Court holds court the first and third Friday of each month, with a morning session and an afternoon session.

23.     The Municipal Court handles thousands of cases per year.   In 2016 alone, the Municipal Court presided over 3,454 filed cases.[5]

24.     The City selects the judge of the Municipal Court and sets the judge's salary.

25.     Judge Kenneth Gomany has served part-time as the sole judge of the Gardendale Municipal Court since his confirmation in December 2016.  Prior to his confirmation, Bobby Lott served as Municipal Court Judge during the time period relevant to this lawsuit.

### B. Failure to Publicly Bid PPS's Exclusive Contract

26.     Defendant PPS is a for-profit private corporation founded in 1992 and operating in various states around the country.   It generates corporate income by charging fees to those it supervises on probation through contracts it executes with local governments.

27.     PPS began operating in Gardendale in 1998 after it contracted with the Municipal Court judge and the City to serve as the City's sole probation provider for

---

[5] *See* Ala. Admin. Office of Courts, *Fiscal Year 2016 Annual Report and Statistics* 163 (2016), *available at* http://www.alacourt.gov/Annual%20Reports/2016AOCAnnualReport.pdf.

defendants appearing before the Municipal Court.

28.     In or around July 1998, then-Municipal Court Judge Norman Winston and PPS entered into the Contract for Probation Supervision and Rehabilitation Services ("Contract"), approved by the then-Mayor of Gardendale, Kenneth A. Clemons.   Contract for Probation Supervision and Rehabilitation Servs. and Addendum ("Contract") (1998), attached hereto as Exhibit A.   The Contract automatically renews each year unless one party gives notice 30 days before its expiration. *Id.* at 3.

29.     The Contract was exclusive: it stated PPS would provide "such probation services as ordered by the [Municipal] Court" and designated PPS the "sole private entity to coordinate, provide and direct probation programs and services to offenders sentenced by and under the jurisdiction of the [Municipal] Court."   Ex. A at 1.   Furthermore, the Contract stated PPS would provide "the services and programs for the misdemeanor offenders placed on probation by the Court."   *Id.*

30.     The Contract was renewed each year since the original execution in 1998, without a public bid process.

31.     On November 1, 2017, Defendant Gomany entered an Order Modifying Terms of Probation Under Supervision of Professional Probation Services ("Modification Order"), Inc. ("PPS").   Pursuant to this Order, all persons "previously sentenced to a term of probation supervised by PPS" were ordered to stop reporting

to PPS; cease making payments to PPS of any fees, fines, and court costs to PPS, as previously ordered by the Court; and pay all outstanding court debt January 1, 2018, or appear in the Municipal Court to request a payment plan.  .

32.    On November 14, 2017, Defendant PPS sent to Municipal Court and City officials its notice of intent to terminate the contract "[a]s a result of the Court order, as well as [the Municipal Court Clerk's] request to transition the caseload and data to the Court."

33.    PPS no longer operates in Gardendale.

## C. PPS's Collection of Monthly Probation "Service" Fees from Persons on PPS Probation

34.    PPS's primary purpose in providing probation services for individuals was to collect its own fees and the fines and costs owed to the Municipal Court.

35.    PPS charged monthly fees to those on probation in the Municipal Court.

36.    Under the Contract, "[f]ees for [PPS's] basic services . . . are payable not by the City, but by sentenced offenders."  Ex. A at 3.  The Contract highlighted that the private probation is a "cost-free program, the support of which rests completely on the private agency, and the offender—not the taxpayer."  *Id.* at 11.

37.    The Contract authorized PPS to bill individuals assigned to probation for program services.  Ex. A at 2.

38.    The Contract required the City to pay PPS 30% of all pre-existing fines

that were delinquent at that the time of the Contract's original execution and that PPS subsequently collected.  Ex. A at 3.

39.     The Contract authorized PPS to charge individuals a monthly fee (listed in the contract as $30 per month) for basic supervision, which should include 1 to 5 office visits per month depending on a "risk result," community service coordination, referral to appropriate agencies to address probation supervisees' needs, and possible home or work visits by the PPS officer—depending on the level of supervision needed and the officer's discretion.  Ex. A at 8.  PPS was also authorized to charge additional fees for additional services, such as anger management, substance abuse, and personal growth classes.  *Id.* at 8–13.

40.     The Contract prohibited PPS from "profit[ing] or attempt[ing] to profit from any fines, restitution, or court cost collected from the offenders," though this prohibition was contradicted by other parts of the Contract that (1) permitted PPS to earn 30% of all fines that were delinquent prior to 1998 and collected by PPS, and (2) permitted PPS to charge a monthly "service" fee for its collection of fines, restitution, and court costs from individuals.  Ex. A at 3.

41.     The Contract was silent as to how money collected by PPS from individuals on probation would be divided between probation service fees owed to PPS and fines and costs owed to the Municipal Court.

42.     The Contract also required PPS to supervise, at no cost, any individuals

whom the Municipal Court deemed indigent.  Ex. A at 8.  As detailed below, however, the Municipal Court did not assess indigency while the Contract was in effect, and PPS generally did not assist in seeking an indigency determination, even where it was clear an individual was having difficulty paying.

### D. __Probation and Probation Conditions__

　　　　　i.　*Initial Assignment to PPS*

43.　　Until November 1, 2017, the Municipal Court assigned defendants to PPS probation in a standard manner.  When an individual appeared on a traffic ticket or misdemeanor offense and was sentenced or otherwise ordered to pay a fine or court costs, the judge asked whether the person could pay the entire amount due on the date of sentencing.

44.　　If a person could not pay the entirety of their fines and costs, the Municipal Court assigned them to supervision by PPS and entered an "Order of Probation" (hereinafter "Probation Order") for that person.  Indeed, the Municipal Court usually informed defendants that paying in full would save them from going on probation.

45.　　If a defendant could pay in full, they were not referred to probation with PPS.

46.　　The Municipal Court did not explain to defendants that PPS was a private, for-profit company. The Probation Order did not identify the probation

provider or supervisor.

47.    The Probation Order did not identify the monthly service fees or total payment due to PPS.

48.    Instead, the Probation Order generally mandated that probation was supervised until the individual paid her "fines, costs, and/or restitution."   The Probation Order also set the length of the term of probation, the suspended sentence, and any other conditions of probation specific to the individual.

49.    A standard example of a Probation Order appears below:

**ORDER OF PROBATION**     **GARDENDALE MUNICIPAL COURT**

NAME: _Jennifer Essig_    DATE: _7/21/17_
LENGTH OF PROBATION: _____ 30 _____ DAYS PROBATED ____ 1 ____ YEARS (s)

**TYPE OF SUPERVISION:**

_____ (1) SUPERVISED FOR LENGTH OF PROBATION.

_____ (2) SUPERVISED FOR COMPLETION OF COURT REFERRAL PROGRAMS.

___X___ (3) SUPERVISED UNTIL FINE, COURT COST AND/OR RESTITUTION PAID.

_____ (4) UNSUPERVISED.

_____ (5) OTHER: _____

**SPECIAL CONDITIONS:** DEFENDANT IS SO ORDERED......

_____ (1) TO PAY FINE, COURT COST, RESTITUTION, FEES TO PROBATION OFFICER.

_____ (2) NOT TO DRINK OR POSSESS ALCOHOLIC BEVERAGES.

_____ (3) NOT TO DRIVE WITHOUT A VALID STATE DRIVER'S LICENSE.

_____ (4) NOT TO DRIVE WHILE UNDER THE INFLUENCE OF INTOXICANTS.

_____ (5) TO ATTEND AND COMPLETE ALCOHOL/DRUG EDUCATION CLASS.

_____ (6) TO ATTEND AND COMPLETE CONSUMER CREDIT LINE CLASS.

_____ (7) TO SEEK VOCATIONAL REHABILITATION MONITORED BY PROBATION OFFICER.

_____ (8) TO PAY FOR DAMAGES TO PROPERTY OR PERSON OF AFFIANT: _____

_____ RESTITUTION AMOUNT $ _____

_____ (9) NOT TO BOTHER, HARASS, OR CONTACT AFFIANT _____.

___X___ (10) TO STAY OFF PROPERTY OF: _Peach Tree Crossings, Gardendale, Al_.

_____ (11) NOT TO OWN OR POSSESS ANY FIREARM OR OTHER WEAPON.

_____ (12) OTHER: _____

_____ **ATTORNEY:** _____    __X__ **WAIVES ATTORNEY**

DATE ____ _Jennifer Essig_ ____ DATE ____ __X__ ____ JUDGE

WHITE: COURT      YELLOW COPY: DEFENDANT

50.     Once the judge signed the Probation Order, he directed the defendant execute it and provided the defendant with a carbon copy.

51.     The judge, however, made no effort to evaluate an individual's income or expenses or to determine the amount she could afford to pay each month.

52.     Nor did the judge explain to individuals the terms of probation or offer

14

them alternatives to payment, such as community service, if they indicated that they could not pay their monetary sentence or probation fees to PPS.

      ii.    *Meeting with PPS and Execution of the PPS-Created Sentence of Probation Form and Enrollment Form After the Sentencing Hearing*

53.    Individuals assigned to PPS probation then met with PPS in a separate room of the Municipal Court courthouse.

54.    During the meeting, PPS completed a PPS-created "Sentence of Probation" form (hereinafter "PPS Sentence of Probation Form"), which a Municipal Court magistrate or magistrate supervisor had previously signed on behalf of the presiding judge.

55.    The PPS Sentence of Probation Form required PPS to fill in the number of months of probation.  PPS typically assigned individuals to 24 months of probation, even though the Municipal Court's Probation Order regularly specified a shorter period of 12 months.

56.    The PPS Sentence of Probation Form also required PPS to specify the amount the probationer must pay PPS each month, including a monthly probation service fee of $40.00 to PPS (corrected by hand from what was printed on the standard form order and more than the amount of $30.00 specified in the Contract, *see* Ex. A at 8), and an amount that that went towards the fines and court costs owed to the Municipal Court, which PPS typically set at a minimum of an additional $40.  By

contrast, the Probation Order did not specify an amount to pay.

57.    The PPS Sentence of Probation Form specified other conditions, such as reporting to the probation supervisor as directed.  By contrast, the Probation Order did not specify these conditions.

58.    The PPS Sentence of Probation Form also listed sixteen other possible conditions of probation that PPS could select from.  Generally, PPS specified on the Form that persons such as Plaintiffs must abstain from the use of alcohol or drugs and submit to random testing and not drive without a valid driver's license.  By contrast, the Probation Order did not specify these conditions.

59.    Once PPS completed the Sentence of Probation Form, the probationer and PPS signed it.  The presiding judge, however, did not further review or approve the Form.

60.    A standard PPS Sentence of Probation Form follows:

IN THE MUNICIPAL COURT OF THE CITY OF GARDENDALE
STATE OF ALABAMA

CITY OF GARDENDALE
VS.

Jennifer Oleen Essig

| OFFENSE | CITATION # | FINE | COURT COST | TOTAL |
|---|---|---|---|---|
| CT30 | MK17-0354 | 50 | 232 | 282 |
| Criminal T | | | | |
| | | | | |
| | | | | |
| | | | | |

**SENTENCE OF PROBATION**

**WHEREAS**, the above disposition has been made against the above named defendant, the defendant is hereby sentenced to confinement for a period of _30_ days and ordered to pay a total fine in the amount of $ _282_ dollars,

**HOWEVER**, it is further ordered by the Court that the defendant is hereby ordered to serve _12_ months on probation subject to the following conditions:

| | | |
|---|---|---|
| | 1.) | Pay a monthly probation service fee of $45.00 to Professional Probation Services, Inc.; |
| | 2.) | Pay all fines which include surcharges within _12_ months; at a rate of $ _20_ per month; |
| | 3.) | Not violate the laws of any governmental unit; |
| | 4.) | Report to the probation supervisor as directed; |
| [ ] | 5.) | Work faithfully at suitable employment insofar as may be possible; |
| [ ] | 6.) | Not change his/her present place of abode, or leave the State without notifying the probation supervisor; |
| [ ] | 7.) | Support his/her legal dependents to the best of his/her ability; |
| [ ] | 8.) | Avoid injurious and vicious habits-especially alcoholic intoxication, and dangerous drugs unless prescribed lawfully; |
| [ ] | 9.) | Avoid persons and places of harmful or disreputable character; |
| [✓] | 10.) | Not to drive without a valid State driver's license; |
| [✓] | 11.) | Abstain from the use of alcohol and drugs, and submit to random alcohol/drug testing; |
| [ ] | 12.) | Complete an alcohol and drug use evaluation and follow all directives for treatment or counseling; |
| [ ] | 13.) | Complete a DUI school program conducted by an agency licensed by the State of Alabama; |
| [ ] | 14.) | Complete _____ hours of community service as directed by the probation officer; |
| [✓] | 15.) | Probation to be unsupervised upon payment of the fine and costs; |
| [ ] | 16.) | Pay restitution in the amount of $_____ to _____ for Citation #_____; |
| [ ] | 17.) | Serve _____ days in the Gardendale City Jail; to report on _____ and released on _____; |
| [ ] | 18.) | Not to bother, harass, or contact affiant _____; |
| [ ] | 19.) | To stay off the property of _Bauchtrees_____; |
| [ ] | 20.) | Kerbow 8-18-17 PM; |

**UPON THE VIOLATION** of any of these conditions, probation may be revoked and the sentence of confinement executed. The defendant is subject to arrest upon the violation of any conditions of probation. **IT IS SO ORDERED**, this _31_ Day of ___July___, 20_17_.

___Kenneth Clemo___
Judge, Gardendale Municipal Court

This is to certify that a true and correct copy of this sentence has been delivered in person to the Defendant who has been duly instructed regarding the conditions of probation.

This _31_ day of ___July___, 20_17_

Probation Officer          Defendant ___Jennifer___

White - Clerk of Court          Yellow - Probation          Pink - Defendant

*Superior Printing* • Fultondale, AL • (205) 849-9900 • **Item # 105**

61.    After completing the PPS Sentence of Probation Form, PPS provided the individual with a carbon copy, along with a PPS Enrollment Form, which identified the probationer's probation officer; the date of her first appointment with PPS; PPS's office hours; and the amount of the probationer's first payment.

62.     The PPS Enrollment Form also set forth the following probation conditions, including:

a.  the probationer must report to the probationer officer as directed;

b.  missed appointments can and will result in the issuance of a warrant for the probationer's arrest; and

c.  the probationer will be scheduled to report once a month unless he is non-compliant with any of the conditions of probation, including payments, in which case the probationer must report weekly with or without payment.

63.     A typical PPS Enrollment Form follows:

PROFESSIONAL PROBATION SERVICES, INC.
1126 MAIN STREET
P.O. Box 1114
GARDENDALE, AL 35071
(205) 608-0994

You have been given a **JAIL SENTENCE**.  Provided that you comply with the conditions of probation, that sentence will remain suspended.  If you cannot or choose not to comply with the conditions of probation, then the probation may be revoked, and you may spend time in jail.

YOUR PROBATION OFFICER IS:     Rachel McCombs

YOUR FIRST APPOINTMENT IS:    7 – 28 – 17

You may report during office hours: **9:00am to 12:00pm or 1:00pm to 4:30pm.**
**OFFICE CLOSED DAILY FROM 12:00 UNTIL 1:00 FOR LUNCH**

YOUR TOTAL MONTHLY PAYMENTS ARE $ 80

*$40.00 Due at 1st Appt*

**MONTHLY PAYMENT DUE AT FIRST VISIT!!!**

***YOUR PAYMENTS CAN BE IN CASH (exact change), MONEY ORDER or DEBIT/CREDIT CARDS***

READ THESE INSTRUCTIONS CAREFULLY!

1.  You must report to your probation officer as directed.  Missed appointments can and will result in the issuance of a warrant for your arrest

2.  You will be scheduled to report once a month unless you are non-compliant with any of the conditions of your probation (including payments).  In this event you will be required to report weekly with or without payment.

3.  Mailing payments does not excuse you from reporting to your probation officer as directed.  You may only mail payments if approved by probation officer.

4.  You may reschedule your appointment on or before the day of your appointment unless it is your first appointment or the Deadline Date (the day all money is due)

5.  The conditions of your sentence are **not** negotiable, and will be strictly enforced.

**Directions to the office:**
* From I-65 North, take Exit 271 (Fieldstown Road) and go Right, Turn left onto Grubbs Ave at 3rd Traffic Light, You will go straight into The Garden shopping center parking lot, The office is on the left, between Taylor Bug's and The Studio
*From Hwy31 North or South take Main Street (runs parallel with Hwy31), Do not go to City Hall, our office is located in The Garden Shopping Center (Across the street from Bradberry Auto Glass & Trim) Turn into the shopping center parking lot and drive straight back, our office is between Taylor Bug's and The Studio.

!!!DO NOT RETURN TO THE COURT OFFICE!!!
YOUR PROBATION APPOINTMENT IS AT THE LOCATION LISTED ABOVE

64.    The PPS Enrollment Form threatened individuals that if they "cannot

comply" with the terms of their probation, they "may spend time in jail."  The form further warned persons on probation, "DO NOT RETURN TO THE COURT OFFICE!!! Your probation appointment is at the [PPS office] location listed above."

65.    The PPS Enrollment Form also stated that individuals could reschedule their appointments on or before the day of their appointment, except for the first appointment or the "Deadline Date" (the date all money was due).

66.    In practice, however, if a person could not appear on the appointment date scheduled by PPS, PPS recorded the missed appointment as non-compliance for failing to appear, even if the person called PPS ahead of time to reschedule the appointment.

67.    At no point during the initial meeting between PPS and the probationer did PPS ever evaluate the probationer's ability to pay or inform them of the availability of fee waivers or alternatives to payment, such as community service.

68.    Individuals were also handed a "Know Your Rights" form from PPS stating indigent persons could not have probation "revoked for failure to pay, alone," and that those "truly unable to pay . . . due to indigency" may have been eligible to have their fines converted to community service work.  A copy of the Know Your Rights form follows:

## KNOW YOUR RIGHTS...

If you are indigent, meaning you do not **have the ability** to pay your fines (which is different than not wanting to pay your fines), your probation cannot be revoked for failure to pay, alone.

Your probation **can be revoked for failing to report** as directed and for other violations, so it is important to report even if you don't have the money to pay.

If you are **truly unable to pay** the monies ordered by the Court due to indigency, you may be eligible to have your fines converted to community service work.

The key to success on probation is to report and comply with all conditions- and to **communicate with your officer** about your situation!

If you are unemployed, your PPS officer can assist you in your job search and even help you develop a resume - just ask.



69.     The Know Your Rights form said nothing about waiving the monthly service fee owed to PPS, and PPS did not otherwise alert individuals to this possibility.

70.     When persons told PPS at this initial meeting that they would be unable to pay or have trouble doing so, PPS did not provide any information about, or assistance to the person in obtaining, an indigency determination by the Municipal Court.  Rather, PPS retained complete discretion to decide whether to grant or seek any financial relief for those who could not pay.

71.     At this initial meeting, PPS did not provide individuals with any

information about or assistance with obtaining community service in lieu of payments, but told individuals that they could discuss it at later appointments. However, because the Municipal Court did not regularly assign people to community service as a payment alternative—and indeed, Judge Gomany represented that he was unable to do so—PPS retained complete discretion to decide whether to allow persons on probation to perform community service in lieu of paying their fees and fines.

72.    PPS never disclosed that it was a private for-profit company.

### E. PPS's Broad Discretion in Probation Conditions and Findings of "Noncompliance"

i.    *Requirements to Report to, and Pay, PPS*

73.    During the period of time that the Gardendale Municipal Court assigned defendants to probation with PPS, PPS operated an office a few blocks from the Municipal Court, where individuals met with PPS "probation officers" on dates set by PPS.

74.    PPS's operated the office from 9:00 a.m. to 12:00 p.m. and 1:00 p.m. to 4:30 p.m. on most weekdays.  It was closed the first and third Fridays of every month when its officers attended court hearings in the Municipal Court, and open approximately one Saturday per month for limited hours.

75.    This schedule was set despite PPS's own representations in the Contract that "PPSI recognizes that traditional office hours may cause the offender to miss

time from work and subsequently discourage prompt payment of monies and participation in rehabilitation programs," and that "our office locations are open Saturdays and evenings, and at 7:30 am on weekdays."  Ex. A at 10.

76.    Individuals assigned to PPS were required to report to the PPS office at least once every 30 days.  Those who could not pay the full monthly amount were required to report once per week.

77.    The primary purpose of in-person appointments was for PPS to collect its "supervision" fees; any additional money an individual could pay above the $40 PPS fee was applied to Municipal Court costs and fines.

78.    To illustrate, when individuals assigned to PPS arrived for their appointments at PPS's office in Gardendale, they were required to first record on a sign-in sheet how much they could pay that day.

79.    The "meetings" took place through a payment window.  Generally, the only questions PPS asked concerned how much the person was going to pay that day and the next reporting date.  The probationer was not required to report any other information to PPS.

80.    A photograph of the payment window and sign-in sheet follows:



81.    Neither during nor between these check-in appointments did PPS provide any actual rehabilitation services in exchange for the fees paid by individuals under PPS supervision.  Rather, PPS only collected and documented the payments the probationer made and informed them of the date and amount of their next payment.

82.    When individuals assigned to PPS probation called the office to move a check-in date due to transportation issues, work schedules, or other conflicts—which the PPS enrollment form stated was acceptable—PPS employees told probationers that they could reschedule appointments.  However, in practice, PPS recorded the person as having "missed" the appointment on the original date, in violation of the terms of their probation.

83.    A sign that hung in the PPS office indicated that a person would receive "24 hours in jail" for a first "violation," "48 hours in jail" for a second violation, and

probation revoked for a third violation.

84.    When individuals informed PPS they could not pay the required amount because they were unemployed or did not make enough money, PPS did not bring this to the Court's attention or help individuals waive the payments, including the monthly probation fee that generates profit for PPS.

85.    When individuals informed PPS they could not pay the required amount because they were unemployed or did not make enough money, PPS did not help them convert their fees and court costs to community service.

86.    PPS decided whether to allow individuals to complete community service in lieu of payment..  Those who asked for community service were generally told by PPS they did not qualify.

87.    PPS occasionally distributed documents to people on probation to collect information about the individual's financial circumstances, but had sole discretion over providing this information to the Municipal Court.

88.    PPS did not regularly offer community service to individuals as an alternative to payments.

      ii.    *Apportionment of Money Collected Between PPS and the Municipal Court*

89.    PPS retained the first $40 of each individual's monthly payment to satisfy its monthly probation fees and paid the remainder, if any, to the Municipal Court.

90.     If the payment was less than $40 or the balance of fees owed to PPS, PPS applied that payment only to its fees and none of it to an individual's court-ordered fees and fines.

91.     PPS maintained records of appointments and payments within its own system.   This information was not independently reviewed or audited by the Municipal Court.

> iii.   *PPS Relied on Collected Monthly Probation Service Fees to Generate Revenue and Coerced Payments and Prolonged Probation Terms to Generate Profit*

92.     PPS generated significant income from its supervision practices of individuals appearing before the Municipal Court.

93.     PPS is a for-profit entity and exclusively relies on these monthly service fees to turn a profit.  It would not be able to function in its current business model, pursuant to the terms of its probation service contracts with municipalities, without collecting fees from the individuals it supervises.

94.     While supervising defendants in Gardendale, Defendant PPS engaged in several practices that allowed it to maximize its profit by extending the period of time individuals were required to report to, and in turn, pay PPS.

95.     PPS increased the amount of time that individuals were on probation, often setting it at the statutory maximum of two years in the PPS Sentence of Probation Form, even when the Municipal Court had only set probation for one year.

This practice increased the period of time in which PPS charged its monthly probation service fee.

96.    PPS also increased the amount of fines from what was ordered at sentencing.   For example, Plaintiff Essig was told at sentencing and on her PPS Sentence of Probation Form that she owed a total of $282:



However, as the below PPS receipt shows, at her first appointment PPS told her she must pay a total of $382.00 to the Municipal Court:



97.    These practices benefitted PPS because requiring additional time on probation or additional fine payments that resulted in an individual taking more time to pay increased the number of monthly service fees paid to PPS.

98.    When PPS employees appeared in the Municipal Court for probation review hearings, those probation officers routinely acted in a non-neutral manner, thereby increasing the likelihood of the Municipal Court entering a contempt sanction against, or revoking probation for, individuals under its supervision.  PPS employees presented unsworn and inadequate—or sometimes false—statements alleging that

28

defendants, like Plaintiffs, missed PPS check-in appointments, that they did not pay PPS, or had engaged in other behavior or made statements PPS found to be objectionable.  By failing to provide the Municipal Court with any context for these alleged violations, such as the person's inability to pay or that the person rescheduled the "missed" check-in appointment, or proof in support, PPS effectively ensured that the individual would be jailed or assessed additional fines for contempt by the Municipal Court without cause, thereby prolonging their term on probation.

99.    At these review hearings, PPS employees represented that individuals were "noncompliant," knowing this representation would result in contempt jail sentences or put probationers in fear that they would be sent to jail in the future.

100.   The prosecutor did not participate in these review hearings.

101.   Defendant PPS did not file formal contempt citations or revocation paperwork before reporting individuals' alleged non-compliance with payment obligations or other PPS probation conditions to the Municipal Court.

102.   Defendant PPS did not provide any information about the alleged violations to individuals (who were without counsel) before a review hearing, minimizing the ability of the probationer to refute the unanticipated allegations.

103.   Defendant PPS did not usually present specific testimony about the alleged violations, making it even more difficult for individuals on probation to refute the allegations about their violations.  Rather, PPS generally testified that individuals

had missed appointments or were "behind" on their payment obligations.

104.   Defendant PPS also did not testify or present to the Municipal Court any evidence about the individuals' inability (or ability) to pay, even if the individual had discussed these issues with PPS at their appointments.

105.   PPS did not request that the Municipal Court order fee waivers or community service instead of payment when individuals requested payment alternatives based on their indigency.

106.   During review hearings in Municipal Court, PPS regularly set the next review date for probationers.  For others who did not have review hearings scheduled, PPS set court dates during probation appointments if PPS wanted to bring the individual to court.  The Municipal Court did not provide any additional notice to the individual of the time, location, or nature of the hearing.

107.   Defendant PPS's representations about individuals' compliance with PPS's probation conditions had severe consequences, such as jail time, for individuals on probation.  Plaintiff Harper, for example, spent five days in jail for allegedly missing check-in appointments, without being informed of the specific appointments she allegedly missed or being given advance notice about PPS's intent to make in-court statements about these appointments or the opportunity to contest them. Plaintiff Jones spent five days in jail after the Municipal Court revoked her probation based on PPS's report to the Municipal Court that Ms. Jones had commented during

a PPS check-in appointment that she did not think it fair to have to continually appear in court because she was complying with her probation.  Plaintiff Essig spent 24 hours in jail, allegedly for missing check-ins, even though Ms. Essig had reported for her appointments and possessed documentation proving her attendance.

108.   PPS did not recommend that individuals receive any credit towards their court debt balance for time served in jail due to contempt rulings, and the court did not give probationers any credit.  Thus, these jail stays merely reinforced the power PPS wielded over the probationer, without allowing the individual any relief from the total amount owed.

109.   Because of Defendant PPS's actions and representations at review hearings, individuals remained on probation with PPS after being released from jail on contempt sentences, with the constant threat of jail at future review hearings unless they satisfied PPS with payments.

110.   Through its actions, policies, and practices, PPS acted with reckless and callous indifference to the constitutional rights of individuals on probation.

111.   Even after multiple lawsuits were filed against PPS and similar companies operating private probation schemes in Alabama, alleging similar violations of rights, PPS continued to operate in Gardendale.  In November 2015, the private probation provider with the most contracts in Alabama—Judicial Corrections Services, Inc. ("JCS")—ceased operations in Alabama after many cities canceled

their contracts over these lawsuits and expressed concerns about JCS's treatment of persons on probation.  PPS did not cease its operations in Gardendale; instead, PPS acquired JCS as a subsidiary on January 1, 2017.

**F.** **Named Plaintiffs**

      i.   *Gina Harper*

112.   Plaintiff Gina Harper lives in Jefferson County, Alabama.   She previously lived in Gardendale from October 2016 to March 2017.

113.   She cleans homes in the Birmingham area to earn money, and previously worked as a sign painter.  She lives with and supports her 15-year-old son, who is autistic.

114.   Many years ago, Ms. Harper suffered from addiction to drugs and alcohol, and received various tickets and criminal charges related to this addiction. Her license was revoked during that time.

115.   She has been sober for 10 years.  Because of her limited income, she has not been able to pay the fees required to reinstate her driver's license.

116.   Ms. Harper received a ticket from the City of Gardendale, Alabama, for driving on a revoked license on February 25, 2017, while living in Gardendale.

117.   On May 5, 2017, Ms. Harper pled guilty to the ticket in Municipal Court. Judge Gomany sentenced her to a $500 fine, $215 in court costs, and 48 hours of jail to serve immediately and assigned her to probation under PPS.

118.   Judge Gomany then asked if Ms. Harper could pay the fine that day. When she said that she could not pay it in full, he filled out and handed her a Probation Order and informed her that she would be on probation.

119.   Judge Gomany did not tell Ms. Harper the conditions of her probation, any fees she would have to pay for probation, or that a private company like PPS would be supervising her while on probation.  He also did not evaluate her for or offer her any alternatives to payment, such as community service or payment plans.

120.   The Probation Order was largely blank.  It said only that Ms. Harper was sentenced to 90 days of suspended jail time, probated for 1 year.   No additional conditions of probation were defined.

121.   A PPS employee, Courtney Waters, escorted Ms. Harper into a small room outside of the courtroom.

122.   Courtney had in front of her a form.  Courtney told Ms. Harper that she must pay PPS $80 per month, $40 of which would go to PPS.

123.   Ms. Harper started crying because she knew that she would not be able to keep up with the payments and she felt what PPS was doing with the money was wrong and illegal.  Ms. Harper was already struggling financially at the time, and she did not have an additional $80 each month.

124.   Ms. Harper had been on private probation with another company, Judicial Corrections Services, Inc. ("JCS"), previously when she could not afford to

pay what she owed to other courts.  She had heard about court cases challenging JCS's practices as illegal and knew JCS no longer operated in any municipal courts.

125.   Ms. Harper asked how PPS was legal and how it was different than JCS. Courtney told Ms. Harper that what JCS was doing was illegal, and that what PPS does is different.  Ms. Harper continued to ask her to explain how it was different. Courtney went to get Municipal Court Magistrate Sherry Baggett, who told Ms. Harper to calm down and that it was "just probation."  Ms. Harper continued to cry and ask questions.  A police officer came in and told Ms. Harper that she would go to jail if she did not "calm down."

126.   When Ms. Harper asked about community service, Courtney said that she had to discuss it with Rachel McCombs, Harper's assigned PPS officer, at her next appointment, which was set for a week later, on May 12, 2017.

127.   Ms. Harper repeated she could not afford the monthly payments and simply wanted to know about alternative options like community service.

128.   Courtney gave Ms. Harper a PPS Sentence of Probation Form and other paperwork, and told Ms. Harper that she would only have to report to PPS monthly if she kept her payments current.

129.   Someone crossed out the writing on Ms. Harper's PPS Sentence of Probation Form that originally stated she would serve only 12 months on probation, as the judge had specified on her Probation Order, and changed it to 24 months.

Nobody discussed with Ms. Harper this change or how long she would be on probation.

130.   Ms. Harper refused to sign the PPS Sentence of Probation Form because no one could explain to her why PPS was legal or answer her questions, and she did not want to sign something she did not understand.  Nevertheless, Courtney told her that she had to report to probation.

131.   Courtney gave Ms. Harper a PPS Enrollment Form that identified her PPS probation officer; the date of her first appointment at PPS's offices; PPS's office hours; and the amount of her first payment.  It stated that missed appointments would result in a warrant, but that she could call to reschedule appointments on or before the date she was required to report.  The PPS Enrollment Form also stated she would be required to report weekly if her payments were not current.

132.   In addition, Courtney gave her an informational sheet from PPS entitled, "KNOW YOUR RIGHTS…," that said she might be eligible to have her fines converted to community service.

133.   Ms. Harper paid $30 that day.  She believes it all went towards PPS's own fee, because her fine balance did not go down, according to receipts she later received from PPS.

134.   Ms. Harper was then escorted by a police officer to the Gardendale City Jail to serve the 48-hour sentence for the ticket.  When she was released from jail, she

was given a review hearing date in the Municipal Court set for approximately two months later.

135.   Ms. Harper was unable to report to her first check-in appointment with PPS because she was working, and also was unable to make her first payment because she did not have the money.  When she called PPS to inform PPS she would not make the appointment, PPS told her to report the following week.

136.   When Ms. Harper reported the following week, she could not pay anything so she asked for community service.  At this appointment, PPS employee Rachel McCombs gave her a form to complete about her income and expenses, and told her to bring it back at a future appointment.

137.   Ms. Harper reported to PPS again on May 22, 2017, unable to pay.  She returned the financial questionnaire to Courtney and asked again for community service.   Courtney told Ms. Harper that community service would have to be discussed with Judge Gomany.  Courtney told Ms. Harper to report again on June 1, 2017.

138.   Ms. Harper did not ask about community service again at her next few appointments, because she understood that it would be discussed at her next court date.

139.   Ms. Harper reported to PPS again on June 1, 2017, but did not have anything to pay.

140.   In early June 2017, Ms. Harper's son injured his neck in a swimming accident, and Ms. Harper took several days off of work to take care of him and bring him to the hospital and doctor's appointments.  She informed PPS by phone of these obligations preventing her from reporting and preventing her from working regularly.

141.   Ms. Harper reported again on June 13, 2017, though she was unable to make a payment.

142.   On June 16, 2017, Ms. Harper appeared in the Municipal Court for a review hearing.  PPS employee Rachel told Judge Gomany that Ms. Harper had not paid her fines.  Ms. Harper explained that she is a single parent of a son with special needs.

143.   Rachel did not raise the issue of community service.  When Ms. Harper asked for it, her request was denied, and she was told to report for another review hearing on August 4, 2017.

144.   At no point during this hearing did PPS represent to Judge Gomany Ms. Harper's financial circumstances, despite the financial information Ms. Harper had provided through PPS's form.

145.   Ms. Harper reported to PPS soon after the hearing and paid $20, which went entirely to PPS fees.  PPS employee Rachel gave her a form to complete by her next appointment to show that she had applied to 20 jobs.

146.   In early July 2017, Ms. Harper's son suffered another injury, breaking his hand.  Ms. Harper missed work to care for him and take him to the hospital and his doctor's appointments.  She informed PPS of this obligation.

147.   She reported on July 14, 2017, making another $20 payment that went entirely to PPS fees.

148.   She informed PPS that she had applied to several jobs and was offered a second job at Dollar General.

149.   Ms. Harper reported for two more appointments, though she was unable to make payments due to the work she had missed earlier in the month.

150.   On August 4, 2017, she appeared before the Municipal Court for another review hearing before Judge Gomany.  PPS employee Rachel reported that Ms. Harper had applied for and been accepted at a second job.  Ms. Harper explained to Judge Gomany that she could not take the job because of her responsibility to take care of her son.  To save money, she had instead taken on a roommate to help with rent.

151.   PPS again did not ask the Municipal Court for community service, but Ms. Harper raised it on her own.  Judge Gomany said that the Municipal Court does not offer community service.  When Ms. Harper pointed out that PPS had mentioned the possibility of community service, Judge Gomany inquired if PPS offered community service.  Rachel indicated that PPS sometimes allows individuals to

complete community service, and said she could talk to Ms. Harper at her next appointment.

152.   Rachel then told Ms. Harper to report to PPS the next week and set Ms. Harper's next court review date for September 15, 2017.

153.   Ms. Harper was unable to report in mid-August because she was dealing with a friend's personal crisis and hospitalization.  Ms. Harper called to let PPS know that she was unable to make it and Rachel rescheduled her appointment.

154.   Ms. Harper reported again on August 25, 2017.   Rachel asked Ms. Harper if she was making a payment.  Ms. Harper did not have a payment, and asked if she could discuss community service.   Despite the conversation at Ms. Harper's last court date that the Municipal Court could not order community service, Rachel indicated that the Municipal Court would need to order community service.   Rachel wrote $250 on Ms. Harper's receipt, which was what she owed for the months she had been on probation.

155.   Ms. Harper counted the number of people on the sign-in sheet at the PPS office that day.  It appeared that 15 people had reported just within the last hour before she came in at 4:15 p.m.

156.   Ms. Harper reported again on August 31, 2017.  PPS employee Courtney asked if she was paying anything.  Ms. Harper said she was unable to pay anything.

Courtney handed Ms. Harper a receipt indicating that she owed $330 at her next appointment on September 8, 2017.

157.   Ms. Harper reported again on September 8, 2017.   She did not have money to pay and again asked for community service.   Courtney stated that she would need to talk to Rachel, who was at the Municipal Court, and Ms. Harper decided to wait.   While talking to Courtney, Ms. Harper became upset and frustrated because PPS would not allow her to do community service and make any progress on her cases, and she began to cry.   Ms. Harper told Courtney that she thought PPS was changing their story about community service each time she asked about it.   She eventually regained her composure and apologized.   Courtney then told her she would not be able to talk to Rachel because "we close at 4:30 and she has a lot of crap to do."

158.   Ms. Harper appeared in the Municipal Court for her most recent review hearing on September 15, 2017.   PPS reported that Ms. Harper had continued to miss appointments and was non-compliant.   Ms. Harper asked the dates and number of appointments PPS was alleging she had missed but did not receive an answer.   PPS employee Rachel also reported that Ms. Harper worked only part-time, and had turned down a second job—misrepresenting her current work situation and failing to report Ms. Harper's inability to work additional hours because of her son—and Ms. Harper tried unsuccessfully to respond.

159.   Ms. Harper was then ordered to jail for five days.

160.   Before this review hearing, PPS never told her it was going to report to the Judge that she had any missed appointments, or which appointments it would represent to the Municipal Court that she had missed.

161.   Ms. Harper also heard Judge Gomany and one of the magistrates discussing a recording.  The Municipal Court took a recess before deciding her case, and she believes that during that time PPS played a recording of her conversation with Courtney during her last appointment.  Nobody played Ms. Harper the recording or allowed  her to explain what had happened.

162.   Court records show Judge Gomany's notes from PPS's testimony that Ms. Harper had "cont. to miss appointments" and was "non-compliant."

163.   Ms. Harper was released from jail on September 20, 2017.  She did not receive any notice of when her next appointment was set.  PPS employee Rachel called Ms. Harper on Monday, September 25 to tell her she missed an appointment the previous Friday.  Ms. Harper explained that she did not have a notice of an appointment.  Rachel set an appointment for the following Friday, September 29.

164.   On September 29, 2017, Ms. Harper reported to the office and asked again about community service.  Rachel informed her that community service can only be completed on weekdays, similar to the hours of a full-time job.  She said that Ms. Harper's full-time job would not allow her to complete community service.

165.   Ms. Harper also asked PPS for a copy of any records PPS kept on her file.   Rachel told her that all of the records would be with the Municipal Court, including records of missed appointments.

166.   No list of missed appointments from PPS appeared in the file Ms. Harper obtained from the Municipal Court.   Her file also does not include any evidence from past hearings or submitted for her future review hearing regarding missed appointments.

167.   Courtney informed Ms. Harper that their system showed seven missed appointments since the beginning of May.   Ms. Harper believes this included appointments that she had called to reschedule and could not attend because of work or family obligations.

168.   Ms. Harper appeared at PPS for her next appointments on October 5, October 13, and October 24, 2017.  Ms. Harper made a $20 payment on October 13— all of which PPS applied to its service fees.   Her most recent receipt from PPS indicates that she owed PPS $150 in supervision fees and the Municipal Court $715 in fines.

169.   Ms. Harper has struggled to make ends meet since she was assigned to PPS in May 2017, given her limited income and the costs of caring for her son's medical needs.  Ms. Harper and her son also struggle to survive off her income and her son's Social Security disability check.

170.   For these same reasons, Ms. Harper struggled to pay PPS each month and to report to PPS each week.  Mr. Harper would have to scrape up $5 to $10 to pay others for a ride to the PPS office, which is at least a 40-minute drive roundtrip from her home.  And because she was required to report weekly, she often missed work to get to the PPS office by the time the office closed at 4:30 p.m.  Though PPS was occasionally open one Saturday per month for a half day, the weekend hours were not frequent enough for Ms. Harper's weekly appointments.

171.   In total, Ms. Harper reported to PPS approximately sixteen times, and to the Municipal Court three additional times, after she was put on probation.  It consumed a significant amount of her time and money to do so.

172.   Ms. Harper tried to talk to PPS about her difficulty reporting weekly and paying $80 per month, because she does not live or work in Gardendale and often could not find reliable transportation.  But PPS repeatedly told her that she had to report each week because she was behind on her payments and had to pay.

173.   PPS never offered her any services or alternatives to payment based on her limited income, despite her numerous requests.

174.   Ms. Harper saw Judge Gomany ask PPS in multiple cases if PPS will take someone back on probation after PPS testified that the probationer was noncompliant.  PPS always indicated that it wanted the person to continue to report, presumably so PPS could continue to collect fees.

175.   Each time Ms. Harper reported to the PPS office, she had to sign into a sign-in sheet and write how much she was paying.  At each appointment, PPS only asked her about her payment and when she could report the following week.

176.   Ms. Harper was given a receipt after each PPS visit, which indicated how much she paid and how the funds were applied to the PPS fee and her court fines. When she could not pay, the receipt indicated "non-payment" and the total amount she was required to pay at the next visit, which increased each month and totaled hundreds of dollars by the time Judge Gomany removed all defendants from PPS pursuant to the Modification Order.

177.   Ms. Harper was only able to pay PPS $90 total—all of which PPS applied to its monthly fees, not her Municipal Court fines and costs.

178.   Defendant Gomany removed her from PPS supervision on November 1, 2017, pursuant to the Modification Order.

ii.   *Shannon Jones*

179.   Plaintiff Shannon Jones lives in Jefferson County, Alabama, with her daughter.  Before moving in with her daughter in 2017, Ms. Jones lived with her mother in Gardendale.

180.   In 2010, Ms. Jones was in a serious car accident, which left her with a broken neck.  As a result of this accident, Ms. Jones is no longer able to work.  She

pays her bills using her disability payment, which is approximately $1,200 per month, but the payment is often not enough to cover all of her expenses.

181.   Ms. Jones appeared in the Gardendale Municipal Court on August 19, 2016, and pled guilty to driving with a suspended license, two charges of driving under the influence, and driving without insurance.  Judge Lott of the Municipal Court orally sentenced her to serve 60 days in jail, starting on August 28, 2016, and read off multiple fines and court costs, without stating the total amount.  He also told her that she would be on probation, and required her to report to the Court Referral Officer ("CRO").  He told her she would need to obtain an interlock device on her car but did not tell her how much it would cost.

182.   The judge also told Ms. Jones that she would be charged $20 for each day she spent in jail, which had to be paid before she would be released.  This meant Ms. Jones would have to pay $1,200 in order to be released.

183.   Judge Lott did not tell Ms. Jones the conditions of her probation, any fees that she would have to pay for her probation, or that a private company like PPS would be supervising her while on probation. He also did not offer her any alternatives to payment, such as community service.

184.   Judge Lott did not inquire into Ms. Jones' income, assets, or ability to pay the costs and fines assessed against her before placing her on probation.

185.   After sentencing, Ms. Jones was escorted out of the courtroom and into another room by Rachel McCombs, an employee of PPS.  Rachel brought a Probation Order, which had been filled out by the judge.  It stated that she had a suspended jail sentence of 30 days and probation for one year.  It required her "to pay fine, court cost, restitution, fees" to her probation officer and to report to CRO, but did not list any other conditions of probation.

186.   Rachel also brought a PPS Sentence of Probation Form with her and filled it out in front of Ms. Jones.  The Form stated that Ms. Jones was sentenced to 240 days in jail and a total of $9,440 in fines and court costs.  It stated that she was required to pay the fines and costs at a rate of $370 per month, as well as an additional $75 per month for an interlock device for a total of $445 per month, over 24 months of probation.  It also ordered her to pay PPS $40 per month for a "probation service fee."  Rachel also checked off on the Sentence of Probation Form other probation conditions, including abstaining from the use of alcohol and drugs and submitting to random alcohol and drug testing.

187.   Rachel did not ask about Ms. Jones' ability to pay the monthly fee.  Nor did she discuss with Ms. Jones the availability of fee waivers, community service, or other alternatives to payment.

188.   Rachel signed the Sentence of Probation form and had Ms. Jones sign as well.  The Municipal Court magistrate supervisor, Sherry Baggett, had already signed on behalf of Judge Lott.

189.   Ms. Jones did not return to the courtroom to review the terms of her probation with Judge Lott, the clerks, or any employee of the Municipal Court.

190.   Rachel also gave Ms. Jones an informational sheet from PPS titled, "KNOW YOUR RIGHTS…" that discussed the rights of indigent persons who were unable to pay.

191.   On August 25, 2016, Ms. Jones went to the PPS office for a check-in. Rachel gave her a receipt that indicated that the $2,000 cash bond that she had posted for her original charges was credited towards her total balance of fines and court costs, and that forty dollars of this bond payment went to PPS fees.  The receipt also indicated that she owed $1,800 in interlock fees—$75 of which had been paid from her bond payment.  The receipt also stated a date to return to court once Ms. Jones was released from jail.

192.   Ms. Jones was booked into jail to serve her sentence on August 28, 2016, and was released on October 26, 2016.  To be released, she paid the $1,200 ordered for the daily costs of her detention.

193.   Ms. Jones appeared for a review hearing in the Municipal Court on November 4, 2016.   Ms. Jones asked Judge Lott about reducing her monthly

payments, and he said that could not be done at this time.  In addition, when Ms. Jones asked how she could be declared indigent, Judge Lott responded any indigency determination would have to be considered and processed by PPS.

194.   Judge Lott asked Rachel when she would like Ms. Jones to return to court and set her next court date according to Rachel's suggestion.  Ms. Jones received a slip listing her next probation appointment and a date to return to court.

195.   After serving her jail sentence, Ms. Jones reported to PPS on November 11, 2016 and paid $225—$40 of which went to PPS fees.  During her check-in, Ms. Jones tried to bring a mathematical error to PPS officer Rachel McCombs' attention in an attempt to correct her monthly payments to a lower amount.  Rachel told Ms. Jones that the math was to reflect Ms. Jones' completion of payments of her fines and costs and PPS fees in 23 months instead of 24 months.  Ms. Jones responded that the math still did not add up, at which point Rachel became angry and told Ms. Jones she had been doing this for 17 years.

196.   During this check-in, Ms. Jones also asked Rachel if she could obtain an indigency form to be declared indigent.  Rachel told Ms. Jones that because she had a private attorney when she was sentenced, she could not be declared indigent and never gave Ms. Jones the indigency form.

197.   When Ms. Jones told Rachel that she was only able to pay $225 that month, Rachel told Ms. Jones she had to pay the remainder by the cut-off date, the week before the end of the month, or risk violating probation.

198.   Ms. Jones returned to the PPS office on November 22, 2016, to pay $220, the remainder of her monthly payment, which she had to scrape together from her limited funds.

199.   Ms. Jones reported to PPS again on December 15, 2016, and paid PPS $445—$40 of which went to PPS's fees.

200.   Ms. Jones also regularly reported to CRO and to the interlock provider as part of her sentence, paying additional money to each of these entities.  She had to obtain rides to each of these locations, including PPS appointments, because she did not have a valid license.

201.   Ms. Jones appeared for a review hearing in the Municipal Court on January 6, 2017. Judge Gomany set her next court date for February 17, 2017, after Rachel indicated when she wanted Ms. Jones to return to court.

202.   Ms. Jones reported again to PPS on January 27, 2017, and paid $445—$40 of which, again, went to PPS's fees.

203.   At her review hearing on February 17, 2017, Ms. Jones asked the judge if she could have the interlock device taken off of her car so she could sell it because she no longer had a license and could not afford insurance.  Judge Gomany approved

the removal of her interlock and then asked Rachel when she would like Ms. Jones to return to court. In response, Rachel set a review court date for March 17, 2017.

204. Ms. Jones reported again to PPS on February 24, 2017, and paid $370—$40 of which went to PPS fees. Ms. Jones' was told that her payment was being dropped to $370 because she no longer had to pay for the interlock, though $75 of her payment went towards "interlock" according to her receipt and her receipt still reported that she owed $1,800 in interlock fees. At Ms. Jones' next appointment, her payment returned to $445.

205. Ms. Jones sold her car and had the interlock removed on March 2, 2017.

206. When Ms. Jones reported to PPS before her court date on March 17, several people were waiting to make their payments to PPS. One woman who had just made her payment to PPS, told everyone waiting in the office that she thought it was crazy that she had to take off work to go to court for probation reviews when she was doing everything right. Ms. Jones responded to this woman that she agreed and that as long as everyone is doing what they are supposed to do, they should not have to go back to court.

207. Ms. Jones then made her normal payment of $445—$40 of which, again, went towards PPS's fees—and left.

208. On March 17, 2017, Ms. Jones appeared for a review hearing in the Gardendale Municipal Court. Ms. Jones showed Judge Gomany documents related

to the sale of her car and the removal of the interlock device.  Rachel told Judge Gomany that at Ms. Jones' last PPS check-in, she said she thought it was stupid that she had to appear at these review hearings.  Judge Gomany then became very angry, revoked her probation, and sentenced her to jail for 240 days without allowing Ms. Jones to respond to these allegations.

209.   Ms. Jones called her mother from the City Jail.  Her family arranged for her daughter's employer, an attorney, to come to court on Ms. Jones' behalf.

210.   The attorney, Mr. Bob Echols, appeared within an hour at the Gardendale Municipal Court.  Upon inquiring about the location of Ms. Jones, the magistrate indicated he was too late.  After Mr. Echols spoke to Judge Gomany, and Judge Gomany reduced Ms. Jones' sentence to five days, which Ms. Jones served at the City Jail.

211.   Ms. Jones met another woman in the jail who informed her that she had been arrested at the PPS office because she could not keep up with payments.

212.   After Ms. Jones was released from jail, her probation was reinstated and she had to continue reporting to Rachel.  Ms. Jones was so fearful of Rachel and that she would be sent back to jail in connection with her probation that she never questioned anything Rachel said, always made her full payments, and always appeared at her appointments—often relying on others to help her do so.

213.   Ms. Jones reported to PPS for the next several months—from April to October.  Each month Ms. Jones made her full payment of $445—$40 of which went to PPS fees.

214.   Family members or others gave her rides to each appointment.

215.   Ms. Jones, however, struggled to pay PPS each month, borrowing money from her mother.  She also delayed seeking healthcare because she could not afford to pay for it while she was also paying PPS.

216.   PPS's and Ms. Jones's interaction at these appointments was only limited to Ms. Jones' payment of money.  At no point did PPS offer Ms. Jones any services beyond payment collection, and Rachel denied Ms. Jones' request for alternatives to the full monthly payments.

217.   Ms. Jones next appeared for review hearings in the Municipal Court on April 21, 2017, and July 7, 2017.  At each review hearing, Judge Gomany asked Rachel about Ms. Jones' compliance with PPS probation and when Ms. Jones should come back for the next hearing.

218.   In November 2017, Ms. Jones went to make her payment at the PPS office and saw a notice on the door instructing individuals to call the magistrate at the Gardendale Municipal Court.  When she called, she was told to come to the court.  A clerk told Ms. Jones that PPS had closed, gave Ms. Jones a new court date, and accepted a payment from her.

219.   Ms. Jones has continued making payments to the Municipal Court and appearing for scheduled review hearings.   Based on her income, Judge Gomany lowered her payments to $200 per month in January 2018, to $100 per month in February 2018, and then to $50 per month in March 2018.

220.   Since 2015, Ms. Jones has paid over $9,000 related to her Gardendale Municipal Court charges—$520 of which went to PPS supervision fees.   According to her last receipt, Ms. Jones still owes $4,195.00 in fines and court costs, which she cannot afford.

iii.   *Jennifer Essig*

221.   Plaintiff Jennifer Essig lives in Jefferson County, Alabama, with her fiancé.

222.   Ms. Essig appeared in the Gardendale Municipal Court on July 21, 2017, and pled guilty to trespassing.   Judge Gomany sentenced her to a $50 fine and $232 in court costs.

223.   Judge Gomany then asked Ms. Essig if she could pay the fines and costs in full.   She said she could pay $40 that day but could not pay the entire amount, because she was on a fixed income.   Judge Gomany then informed Ms. Essig that she would have to pay the rest through probation.

224.   Judge Gomany did not inquire into Ms. Essig's income, assets, or ability to pay the costs and fine assessed against her prior to placing her on probation.

225.   Ms. Essig had been in a serious car accident in May 2017, which required her to wear a back brace and resulted in an inability to walk without difficulty.  Because of her condition, she is unable to work and pays her bills using her disability payments.  Ms. Essig's medical condition was visible to PPS during her court appearance.

226.   Judge Gomany handed Ms. Essig a Probation Order and told her to sign it.

227.   Judge Gomany did not tell Ms. Essig the conditions of her probation, any fees she would have to pay for probation, or that a private company, like PPS, would be supervising her while on probation.  He also did not offer her any alternatives to payment, such as community service.

228.   Ms. Essig was escorted out of the courtroom and into another room by Courtney Waters, an employee of PPS.  Courtney brought a PPS Sentence of Probation Form with her and filled it out in front of Ms. Essig, noting that Ms. Essig would pay PPS $40 per month for a "probation service fee," and that she would repay all of her fines and costs at a rate of $80 per month over the next 12 months.  Courtney also checked off other probation conditions on this form.

229.   Courtney did not ask about Ms. Essig's ability to pay the $80 per month fee, nor did she inform Ms. Essig about the availability of fee waivers, community service, or other alternatives to payment.

230.   Courtney had Ms. Essig sign the form, which had already been signed by Rachel McCombs, another PPS employee, and the Municipal Court magistrate supervisor, Sherry Baggett, on behalf of Judge Gomany.

231.   Ms. Essig did not return to the courtroom to review the terms of her probation with Judge Gomany, the clerks, or any employee of the Municipal Court.

232.   Courtney also presented Ms. Essig with another document on PPS letterhead that stated, "MONTHLY PAYMENT DUE AT FIRST VISIT!!!," along with the name of her PPS probation officer; the date of her first appointment at PPS's offices; PPS's office hours; and the amount of her first payment.  This PPS Enrollment Form stated that individuals can reschedule their appointments on or before the day of their appointment, aside from the first appointment or the "Deadline Date" (the date all money is due).

233.   Courtney also gave Ms. Essig an informational sheet from PPS titled, "KNOW YOUR RIGHTS…"

234.   Ms. Essig gave Courtney her $40 payment and received a hand-written receipt.  She was not told that this payment would be applied solely to PPS's monthly supervision fee and not to her court costs and fine.

235.   Ms. Essig reported to PPS on July 27, 2017, and paid $40, bringing her total for the first month to $80.

236.   At her PPS appointment, Ms. Essig received a receipt indicating the total amount of her fines and costs, as well as PPS's supervision fee; the amount she had paid towards each of these line items; and her outstanding balance.   The receipt showed that PPS had added an additional $100 to Ms. Essig's court fines without an explanation.

237.   Ms. Essig's PPS receipt from July 27 indicated she had an appointment on August 1, even though Ms. Essig had been on probation for only one week and already had paid one month's worth of payments to PPS.   Ms. Essig does not recall whether she reported to this appointment or not.

238.   Ms. Essig reported to PPS again on August 11, 2017, and paid $20.   PPS told her to report every week.

239.   Ms. Essig reported to PPS again on August 17, 2017, as scheduled, and paid $28.

240.   Ms. Essig appeared for a review hearing in the Municipal Court on August 18, 2017.   Prior to the hearing, PPS never provided her with any notice that it would present evidence to the Court about her probation compliance and that she could face jail time based on that evidence.   Specifically, PPS did not tell Ms. Essig before her hearing that she had allegedly missed probation appointments. She was not notified that she had the right to an attorney.

241.   At the hearing, PPS employee Rachel McCombs told Judge Gomany that Ms. Essig had missed three PPS appointments, but she did not provide any more information or evidence to the Judge or to Ms. Essig.  Ms. Essig also was not given the opportunity to show she had reported to PPS three times since her initial court date less than a month prior, and she was sentenced her to 24 hours of jail.

242.   Rachel told Judge Gomany she wanted Ms. Essig to report back to court for another review hearing on October 6, 2017.

243.   Ms. Essig was given a piece of paper from the clerk stating that she was serving 24 hours in jail and that her next court appointment was October 6, 2017.

244.   Ms. Essig was escorted to the jail and released the following day, August 19, 2017.

245.   Ms. Essig reported to PPS on August 24, 2017, and paid $20, bringing her total payments to PPS for August to $68.

246.   The PPS receipt from Ms. Essig's August 24th visit shows that she did not receive any credit towards her court costs and fine for her 24 hours spent in jail.

247.   Ms. Essig reported to PPS on September 8, September 14, September 22, September 29, and October 3, 2017, and made a payment at each appointment. She paid off her balance at her October 3 appointment.

248.   At each of her PPS appointments, PPS asked only how much money she would be paying and when she would report the next week.  At no point did PPS offer Ms. Essig any services beyond payment collection.

249.   Ms. Essig was scared of being sent back to jail at her next review hearing, so she used half of her monthly disability payment to pay off PPS.  She struggled to pay for necessities of life that month, including groceries and gas, because of her payments to PPS.

250.   When in the PPS office on one visit, Ms. Essig heard PPS employee Rachel McCombs tell another individual that she would be put in jail for a week if she did not make her payments to PPS.

251.   Because Ms. Essig lived 45 minutes from the PPS office in Gardendale and had limited access to a car, it was very difficult and expensive for her to report to PPS each week.  Though Ms. Essig told PPS about her difficulty reporting weekly, PPS told Ms. Essig she had to report each week because she couldn't pay $80 up front.  PPS also did not offer Ms. Essig alternatives to payment, such as community service.  Nor did PPS offer to waive Ms. Essig's fees, despite knowing that her only income was from her disability payments.

252.   While reporting, Ms. Essig often saw a line of other people waiting to report and pay.

253.   In total, Ms. Essig paid PPS $160 in supervision fees for a probation period that lasted just under two and a half months, from July 21, 2017, to October 3, 2017.

254.   Ms. Essig paid $382 in fines and costs to the court, which is $100 more than she was sentenced to pay by Judge Gomany.

## V.   **CLASS ALLEGATIONS**

255.   Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), Plaintiffs Harper and Jones seek to certify a Class related to Claim One only, for which they seek actual and punitive damages.   This proposed Class is defined as: All individuals who were supervised by PPS for cases in the Gardendale Municipal Court on or after December 28, 2015.   This Class is referred to as the Damages Class.

256.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(b)(a) and the requirements of Rule 23(b)(3).

### A. **Rule 23(a) Requirements**

i.   *Numerosity*

257.   The precise size of the Damages Class is unknown but substantial.   For example, PPS reported after starting its operation in Gardendale in 1998 that it had supervised 232 people on probation in its first six months, and on one given day in 2017, Plaintiff Harper observed that 15 people reported for probation in just one hour based on her review of one recent sign-in sheet at the PPS office.   Over three hundred

people were on PPS probation when Plaintiffs filed this lawsuit.  Therefore, Plaintiffs estimate that hundreds of individuals who were assigned to PPS probation over the last two years would be members of the Damages Class.

258.   Moreover, the Damages Class is comprised of low-income individuals who were placed on probation with PPS because they could not afford to pay the full fines and costs they owed at sentencing.

259.   Thus, joinder of every class member would be impracticable.

    ii.   *Commonality*

260.   Plaintiffs Harper and Jones raise claims based on questions of law and fact that are common to, and typical of, the members of the putative Damages Class.

261.   <u>Questions of fact common to the Proposed Damages Classes include</u>:

    a.   Whether PPS made supervision-related decisions concerning Plaintiffs Harper's and Jones' and the proposed Damages Class members' probation conditions, including deciding and prolonging the length of probation and the date and number of times individuals must report and pay;

    b.   How PPS profited from its supervision of PPS supervisees;

    c.   The amount of fees PPS collected from its supervisees;

    d.   Whether PPS applied all monies paid by supervisees first to the PPS fee and second to court-imposed fines and costs;

    e.   Whether PPS charged individuals monthly service fees;

      f.     PPS's role in review hearings and deciding whether individuals were noncompliant and should have been punished for contempt; and

      g.     PPS's role in setting appointment dates and review hearings.

262.  <u>Questions of law common to the Proposed Damages Class include</u>:

      a.     Whether PPS's supervision of individuals in whose cases it has a direct financial interest violates its duty of neutrality under the Fourteenth Amendment Due Process Clause; and

      b.     Whether actual and punitive damages are appropriate against PPS.

263.  These common legal and factual questions arise from one central scheme: PPS's enormously profitable contractual relationship with the Municipal Court Judge that governed the City's probation supervision practices.  PPS operated this scheme in materially the same manner every day, with every person assigned to PPS.  The material components of the scheme did not vary among members of the proposed Damages Class, and the resolution of these legal and factual issues will determine whether all of the members of the proposed Damages Class are entitled to the relief that they seek.

     iii.   *Typicality*

264.  Plaintiffs Harper's and Jones' claims are typical of those asserted on behalf of the proposed Damages Class.  Because Plaintiff Harper and Jones and the

proposed Damages Class challenge the same unconstitutional, unlawful Contract and PPS's unconstitutional practices thereunder, it is anticipated that PPS will assert similar defenses against Plaintiffs Harper and Jones and members of the proposed Class.

265.   Plaintiffs Harper and Jones suffered injuries from PPS's violations of the Due Process Clause.  The answer to whether PPS's scheme was unlawful, as the foregoing alleges, will determine the success of Plaintiffs Harper's and Jones' claims and every other member of the proposed Damages Class.  If the named Plaintiffs Harper and Jones succeed in their claims that PPS's policies and practices violate their federal rights, that ruling will likewise benefit every other member of the proposed Damages Class.

iv.   *Adequacy*

266.   Plaintiffs Harper and Jones will fairly and adequately protect the interests of the proposed Class.  Plaintiffs Harper and Jones have no interests separate from, or in conflict with, those of the proposed Damages Class they seek to represent as a whole, and they seek damages on behalf of all members of the proposed Damages Class.

**B. Rule 23(g): Class Counsel**

267.   Plaintiffs Harper and Jones are represented by attorneys from the Southern Poverty Law Center, who have experience in class-action litigation

involving civil rights law, as well as experience litigating policies and practices of municipal courts that are unconstitutional.  Counsel have the resources, expertise, and experience to prosecute this action.

### C. Rule 23(b)(3) Requirements

268.   Because the question of liability can be determined on a class-wide basis and common issues of law and fact overwhelmingly predominate in this case, certification of Plaintiffs Harper's and Jones' proposed Damages Class under Fed. R. Civ. P. 23(b)(3) is appropriate.  The common questions of fact regarding the Contract and Defendant PPS's operation of the private probation scheme pursuant to that Contract, and the common questions of law regarding the constitutionality of the Contract and the operation of that scheme thereunder, are dispositive of the issue of whether every member of the proposed Damages Class is entitled to damages.  The viability of Plaintiffs Harper's and Jones' and Damages Class members' claims will depend on a determination as to PPS's conduct and the legality thereof.

269.   A class action is also the superior means of fairly and efficiently adjudicating the claims of the hundreds of members of the proposed Damages Class against Defendant PPS, as compared to hundreds of individual lawsuits.

# VI.   CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of the Due Process Clause of the
### Fourteenth Amendment of the U.S. Constitution
### Based on PPS's Financial Conflict of Interest in Probation Cases

*Plaintiffs Harper and Jones, on their own behalves and on behalf of the proposed Damages Class, and Plaintiff Essig, on her own behalf, against Defendant PPS*

270.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

271.   Pursuant to the Contract under which the private probation scheme at issue was operated, PPS performed traditional governmental functions of probation supervision for the City and the Municipal Court.

272.   The Due Process Clause of the Fourteenth Amendment requires probation providers such as PPS to serve as neutral information gatherers and neutrally assist the Municipal Court in fairly discharging sentences and prohibits probation providers from having a personal financial interest in the probation cases they supervise.

273.   The policies and practices of PPS in executing the Contract, however, created a direct financial stake for PPS—a for-profit corporation—in every decision PPS made concerning the supervision, enforcement, and revocation of Plaintiffs' Municipal Court probation.

274.   Due to this financial interest, PPS was not incentivized to operate as a

neutral public court officer or to instruct individuals to seek waivers of any fees, assist individuals in reporting their indigency to the Judge, or evaluate the indigency of individuals itself.  Rather, PPS was incentivized to maximize corporate profit in deciding probation conditions for Plaintiffs and members of the proposed Damages Class; how to enforce the conditions; what information to provide Plaintiffs and members of the proposed Damages Class about their rights and obligations while on probation; which statements to submit to the Municipal Court about the probation compliance of the members of the proposed Class; and what sanctions to recommend to the Municipal Court  for alleged probation violations.

275.   Through its actions, policies, and practices, PPS acted with reckless and callous indifference to the constitutional rights of Plaintiffs and of other individuals on probation.

276.   Thus, PPS's policy and practice of administering private probation for Plaintiffs and members of the proposed Damages Class—pursuant to the Contract and PPS-created Sentence of Probation Form—violated longstanding due process restrictions against such self-interested financial arrangements under the Fourteenth Amendment.

277.   These policies and practices injected PPS's financial interest into the probation supervision and enforcement process in Gardendale and PPS's probation-related decisions in violation of the Due Process Clause.

278.   Plaintiffs Harper and Jones and members of the proposed Damages Class they seek to represent, as well as Plaintiff Essig are entitled to actual and punitive damages against Defendant PPS in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Abuse of Process

*Plaintiffs, individually, against Defendant PPS*

279.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

280.   PPS abused the process of probation in the Municipal Court by misusing the Probation Order and Sentence of Probation Form granting them authority to supervise probation to extort money from Plaintiffs for PPS's own profit.

281.   PPS intentionally misused these orders by threatening Plaintiffs with jail sentences, failing to give them full information about their due process and other rights, and failing to provide a process for evaluating or presenting indigency to the Municipal Court when Plaintiffs were unable to pay.

282.   Plaintiffs are entitled to an award of damages against PPS in an amount to be determined at trial, including punitive damages.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court grant them the following relief:

a.      the exercise of jurisdiction over this action;

b.      certification of Plaintiff Harper's and Jones' proposed Damages Class under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure in connection with the First Claim for Relief;

c.      an award of damages, including punitive damages, to Plaintiffs and members of the proposed Damages Class and against Defendant PPS under the First Claim for Relief;

d.      an award of damages, including punitive damages, to Plaintiffs and against Defendant PPS under the Second Claim for Relief;

e.      an award of prevailing party costs, including attorney fees; and

f.      such other relief as the Court deems just and appropriate.

**TRIAL BY JURY IS DEMANDED ON FIRST AND SECOND CLAIMS FOR RELIEF.**

DATED this April 23, 2018.          Respectfully submitted,

/s/ Sara Zampierin
Sara Zampierin
*On Behalf of Plaintiffs' Counsel*

Sara Zampierin (ASB-1695-S34H)
Emily C.R. Early (ASB-8536-B18H)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama  36104
P: (334) 956-8200
F: (334) 956-8481
E: sara.zampierin@splcenter.org

E: emily.early@splcenter.org
**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date the foregoing was filed through the Court's

CM/ECF filing system, and by virtue of this filing notice will be sent electronically

to all counsel of record, including:

> Bryan A. Grasyon
> Stephen E. Whitehead
> Devon K. Rankin
> LLOYD, GRAY, WHITEHEAD & MONROE, P.C.
> 880 Montclair Road, Suite 100, Birmingham, Alabama 35213
> *Counsel for Defendant Professional Probation Services, Inc.*

DATED this April 23, 2018.

/s/ Sara Zampierin
Sara Zampierin