## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CATHERINE REGINA HARPER,**<br>**on behalf of herself and those similarly**<br>**situated, et al.,** ] | |
| ] | |
| **Plaintiffs,** ] | |
| ] | |
| **v.** ] | **2:17-cv-01791-ACA** |
| ] | |
| **PROFESSIONAL PROBATION** ] | |
| **SERVICES, INC., et al.,** ] | |
| ] | |
| **Defendants.** ] | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the court on Defendant Professional Probation Services, Inc.'s motion to dismiss the second amended complaint. (Doc. 57).

In this case, Professional Probation Services (PPS) contracted with the Municipal Court of the City of Gardendale, Alabama, to perform probation supervision for the Municipal Court. Under the contract, neither the Municipal Court nor Gardendale had to pay PPS for its services because PPS charged offenders who had been sentenced to probation monthly service fees. Three of those probationers—Catherine Harper, Shannon Jones, and Jennifer Essig— brought this lawsuit, alleging that PPS violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution because it had a financial conflict of interest in the probation cases assigned to it, and that PPS violated

Alabama law by abusing the process of probation to extort money from the probationers it supervised. Ms. Harper and Ms. Jones bring their claims individually and on behalf of a putative class, and Ms. Essig brings her claims individually.

PPS moved to dismiss the complaint, asserting that the court lacks subject matter jurisdiction over the due process claim under the *Rooker-Feldman* doctrine and that Plaintiffs failed to state either a due process claim or an abuse of process claim. The court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss.

First, the court finds that the *Rooker-Feldman* doctrine does not bar this court's consideration of the due process claim because no state court has adjudicated Plaintiffs' claims, nor are their claims inextricably intertwined with the state court judgments against them. Next, the court concludes that Plaintiffs have not stated a due process claim against PPS because they have not alleged facts showing that any due process violations were attributable to PPS and, even if they have alleged those facts, the State has provided an adequate post-deprivation remedy. Accordingly, the court **GRANTS** the motion to dismiss Plaintiffs' due process claim and **DISMISSES** that claim **WITH PREJUDICE**. Finally, the court determines that Plaintiffs have stated an abuse of process claim because they allege that PPS, acting with an ulterior purpose, used the probation process to

extract additional money from them. The court therefore **DENIES** the motion to dismiss the abuse of process claim.

## I.     BACKGROUND

At this stage, the court must accept as true the factual allegations in the complaint and construe them in the light most favorable to the plaintiff. *Butler v. Sheriff of Palm Beach Cty.*, 685 F.3d 1261, 1265 (11th Cir. 2012). The court may also consider exhibits attached to the complaint. *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). Plaintiffs attach to their second amended complaint PPS's contract with the Municipal Court. (*See* Doc. 56-1). As a result, the court's description of the facts incorporates not only Plaintiffs' allegations but the content of the contract.

PPS is a for-profit corporation that supervises probationers. (Doc. 56 at 8). Gardendale's Municipal Court hears cases involving city ordinance violations, including traffic tickets and misdemeanors. (*Id.* at 7–8). In 1998, a judge of the Municipal Court and PPS entered a contract under which PPS agreed to serve as the Municipal Court's sole probation provider. (*Id.* at 8–9; Doc. 56-1). Under the contract, PPS did not charge Gardendale for its services because probationers paid monthly fees to PPS to cover the costs of supervision and any additional services, such as anger management or substance abuse classes. (Doc. 56 at 10–11). The contract permitted PPS to charge probationers $30 per month for basic probation

services. (Doc. 56-1 at 9). In practice, PPS charged offenders a $40 monthly supervision fee. (Doc. 56 at 15).

With PPS in charge of providing probation services, a typical case would proceed as follows. The Municipal Court would order an offender to pay a fine or court cost and, if the offender could not immediately pay the entire amount owed, the Court would automatically issue a probation order assigning the offender to probation. (*Id.* at 11). A standard probation order would list the length of probation, the type of supervision, and any special conditions, such as completion of vocational rehabilitation. (*See id.* at 14). The probation order did not state the amount of any fine or court costs. (*See id.*).

After the Municipal Court issued the probation order, the offender would meet with a PPS employee in a different room within the courthouse. (*Id.* at 15). The Municipal Court judge would have pre-signed a "Sentence of Probation" form, and the PPS employee would complete the form during the first meeting with the new probationer. (*Id.*). The Sentence of Probation form indicated the total fine and court costs owed, the monthly service fee of $40, the length of probation, and any additional conditions. (*See id.* at 15–16). The Municipal Court judge did not review the Sentence of Probation form after PPS filled it out. (*Id.* at 16).

After filling out the Sentence of Probation form, the PPS employee would complete a PPS Enrollment Form, which listed the name of the probationer's

probation officer, the date of her first appointment at PPS, the amount due at that appointment, and instructions for the probationer, including how and by when probationers could reschedule appointments. (*Id.* at 17–19).

The contract between PPS and the Municipal Court indicates that the Municipal Court would make any indigency determinations. (*See* Doc. 56-1 at 9 ("Those offenders the Court shall determine as indigent shall be ordered as such and supervised at no cost."). But in practice, the Municipal Court did not assess indigency and PPS did not evaluate probationers for indigency or assist them in obtaining an indigency determination from the Municipal Court. (Doc. 56 at 11–12, 20).

At probation review hearings, the probation officer would appear at the Municipal Court with the probationer. (*Id.* at 28–29). PPS would report offenders' alleged non-compliance with the probation conditions to the Municipal Court without filing a contempt citation or revocation paperwork, and it did not provide probationers with any information about the alleged violations. (*Id.* at 29). When offenders had their probation revoked and spent time in jail, they did not receive any credit toward the fine or court costs. (*Id.* at 31). And when offenders could pay only a part of the amount due monthly, PPS took its $40 fee out of that amount before applying any of the payment to the probationer's fine or court costs. (*Id.* at 23). Finally, PPS never offered any additional services, such as substance abuse

treatment or anger management classes, to probationers. (*Id.* at 24). Instead, PPS simply required probationers to appear for in-person appointments to make a payment and receive the next appointment date. (*Id.*).

On November 1, 2017, a Municipal Court judge ordered all probationers supervised by PPS to stop reporting to PPS, to stop making payments to PPS, and to either pay the Municipal Court all outstanding court debt or appear in court to request a payment plan. (*Id.* at 9–10). After the Municipal Court entered that order, PPS terminated its contract with the Court. (*Id.* at 10). PPS no longer operates in Gardendale. (*Id.*).

Against that background, the court will describe the factual allegations particular to Ms. Harper, Ms. Jones, and Ms. Essig, all offenders whom the Municipal Court sentenced to probation under PPS. (*Id.* at 32, 45, 53).

### 1.    Gina Harper

In February 2017, Ms. Harper pleaded guilty to driving on a revoked license, and the Municipal Court imposed a $500 fine, $215 in court costs, a sentence of 48 hours of jail to serve, and one year's probation. (Doc. 56 at 32–33). A PPS employee informed Ms. Harper that she would have to pay PPS $80 per month, of which $40 was the monthly supervision fee. (*Id.*). Ms. Harper's Sentence of Probation form changed her period of probation from twelve months to twenty-four months. (*Id.* at 34).

Over the next eight months, Ms. Harper repeatedly told her probation officer that she could not afford to pay $80 per month and asked about performing community service instead. (*Id.* at 34–36, 39–41). Her probation officer told her to discuss community service with the Municipal Court, but when she asked the Municipal Court, the judge told her and her probation officer that PPS, not the Court, had to order community service. (*Id.* at 38–39). The same probation officer later told Ms. Harper that PPS could not give her community service unless the Municipal Court ordered it. (*Id.* at 39). When Ms. Harper continued to ask about community service, the probation officer told her that she could not complete community service because she worked a full-time job, and community service could be performed on only weekdays. (*Id.* at 41). Over the period during which PPS supervised Ms. Harper's probation, she never made a full payment, typically paying nothing or between $20 and $30. (*Id.* at 35–44). By the time the Municipal Court ordered all probationers to stop reporting to PPS, she had paid $90 total, all of which went toward PPS's monthly fees, and none of which had been applied to her fine or court costs. (*Id.* at 44).

Ms. Harper also missed a number of appointments, but she alleges that she almost always called before the scheduled appointment to reschedule. (*Id.* at 36–43). The only time she missed an appointment without rescheduling it beforehand was when PPS failed to notify her of the appointment. (*Id.* at 41).

In September 2017, Ms. Harper's probation officer reported to the Municipal Court that Ms. Harper had missed appointments and was non-compliant with the terms of her probation. (*Id.* at 40). Ms. Harper asked for a list of the appointments she had missed but received no answer. (*Id.*). She asserts that the probation officer was counting appointments that she had rescheduled pursuant to the instructions given by PPS to probationers. (*Id.* at 42). Based on the probation officer's representations that Ms. Harper was non-compliant, the Municipal Court ordered her to jail for five days. (*Id.* at 40–41).

2.    Shannon Jones

On August 19, 2016, Plaintiff Shannon Jones pleaded guilty to driving with a suspended license, two charges of driving under the influence, and driving without insurance. (Doc. 56 at 45). The Municipal Court orally sentenced her to 60 days in jail and various fines and court costs, but the probation order that PPS gave Ms. Jones after the hearing stated that she had a suspended jail sentence of 30 days and probation for one year, and that she would have to "pay fine [sic], court costs, restitution, fees." (*Id.* at 46). Neither the oral sentence nor the probation order indicated the total amount Ms. Jones owed. (*Id.* at 45–46).

After the hearing, Ms. Jones met with a PPS employee who gave her a Sentence of Probation form, which, in contrast to the oral sentence and probation order, stated that Ms. Jones was sentenced to 240 days in jail (instead of 30 or 60

days), two years' probation (instead of one year), and $9,440 in fines and court costs. (*Id.* at 46). The form informed Ms. Jones that she would have to pay PPS $445 per month, made up of $370 for the fines and court costs and $75 monthly for an interlock device. (*Id.*). She would also have to pay the monthly service fee of $40. (*Id.*). Accordingly, the total amount Ms. Jones owed PPS each month was $485.[1] (*See id.*).

At her first court review hearing, Ms. Jones requested a reduction in her monthly fees and asked how she could be declared indigent. (*Id.* at 47–48). The Municipal Court told her that it could not reduce her monthly payments and that PPS had to consider and process her request for an indigency determination. (*Id.*).

At another court review hearing, Ms. Jones received permission to remove the interlock device so that she could sell her car. (*Id.* at 49–50). PPS told her that her monthly payment would be dropped to $370 because she no longer had to pay the $75 for the interlock device. (*Id.* at 50). But after one month of the reduced payment, her monthly payment went back up to $445, of which $40 went toward PPS's monthly fees.[2] (*Id.* at 50).

---

[1] The court notes that $9,440 divided by 24 months equals $393.33 per month, not $370. Adding the $75 interlock fee and the $40 service fee would bring the monthly total to $508, not $485. Because it does not affect the disposition of the motion to dismiss, the court need not resolve the discrepancy.

[2] In another mathematical discrepancy, the second amended complaint alleges that, after Ms. Jones sold her car and PPS was supposed to stop charging

Once PPS terminated its contact with Gardendale, the Municipal Court lowered Ms. Jones' monthly fees based on her income, and she now pays $50 per month.  (*Id.* at 53).  As of the filing of the second amended complaint, Ms. Jones had paid over $9,000, of which $520 went to PPS's fees.  (*Id.*).  She still owes $4,195 in fines and court costs.  (*Id.*).

3.    Jennifer Essig

On July 21, 2017, Plaintiff Jennifer Essig pleaded guilty to trespassing. (Doc. 56 at 53).  The Municipal Court imposed a $50 fine and $232 in court costs. (*Id.*).  At her first probation appointment, Ms. Essig received a receipt showing an additional $100 in court fines.  (*Id.* at 27–28, 56).  The receipt provided no explanation for the increase.  (*Id.*).

Although Ms. Essig owed at least $80 per month, she frequently paid under $30.  (*Id.* at 55–56).  At a review hearing, her probation officer, informed the Municipal Court that she had missed appointments.  (*Id.* at 56–57).  The Municipal Court sentenced her to 24 hours' jail time.  (*Id.* at 57).

Ms. Essig paid off her balance by October 3, 2017.  (*Id.* at 57).

---

her for the interlock device, it continued to require her to pay $445, of which $40 went toward its monthly service fees.  (Doc. 56 at 50).  But the second amended complaint had alleged that Ms. Jones originally owed $485, of which $40 would go toward PPS's monthly fees.  (*See id.* at 46).  Again, although the court notes the discrepancy, the court need not reconcile these numbers because the motion to dismiss does not depend on them.

<u>4.      The Lawsuit</u>

Plaintiffs filed their initial complaint in October 2017, naming PPS, the City of Gardendale, and Municipal Court Judge Kenneth Gomany.  (Doc. 1).  They filed an amended complaint against the same defendants in December 2017.  (Doc. 33). In March 2016, the court dismissed the claims against Gardendale and Judge Gomany.  (Doc. 49).  Plaintiffs then filed a second amended complaint alleging that PPS: (1) violated the Due Process Clause of the Fourteenth Amendment; and (2) abused the process of probation, in violation of Alabama law.  (Doc. 56 at 64–67).

## II.      DISCUSSION

PPS moves to dismiss the second amended complaint, contending that the court lacks subject matter jurisdiction and, in the alternative, that Plaintiffs fail to state a claim under federal or state law.  (Doc. 58).  The court will address the jurisdictional argument first.

<u>1.      *Rooker-Feldman*[3] Doctrine</u>

Federal Rule of Civil Procedure 12(b)(1) permits a district court to dismiss a claim or a complaint for "lack of subject-matter jurisdiction."  *In re Weaver*, 632 F.2d 461, 463 n.6 (11th Cir. 1980).  "A defendant can move to dismiss a complaint

_____

[3]  The *Rooker-Feldman* doctrine draws its name from the Supreme Court's decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

under Rule 12(b)(1) for lack of subject matter jurisdiction by either facial or factual attack." *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). Here, PPS makes a facial attack on the court's subject matter jurisdiction based on the *Rooker-Feldman* doctrine.

The *Rooker-Feldman* doctrine prohibits federal courts from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005). In the Eleventh Circuit, a claim is barred by the *Rooker-Feldman* doctrine if it was "actually adjudicated by a state court" or is "inextricably intertwined with a state court judgment." *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1286 (11th Cir. 2018) (quotation marks omitted). A claim is "inextricably intertwined if it asks to effectively nullify the state court judgment, or it succeeds only to the extent that the state court wrongly decided the issues." *Id.* (quotation marks omitted).

PPS argues that under the *Rooker-Feldman* bar, the court lacks jurisdiction to consider the due process claim because that claim attacks the legality of the Municipal Court's probation orders requiring Plaintiffs to report and pay service fees to PPS. (Doc. 58 at 7–8). The court disagrees. Contrary to PPS's contention, Plaintiffs attack PPS's administration of their terms of probation, not the Municipal

Court's decision to place them on probation with PPS. As another judge of this court has explained in a case involving similar claims, "[p]roperly understood, [the plaintiffs' claims] do not ask the court to undo the orders or sentences issued by the Municipal Court. Rather, they request that . . . Defendants be required to pay damages for constitutional violations allegedly caused by the administration of those orders and judgments." *Ray v. Judicial Corr. Servs.*, 270 F. Supp. 3d 1262, 1292–93 (N.D. Ala. 2017). "Simply put, a claim challenging actions taken . . . in execution of [a] judgment or order can be distinct from a challenge to the judgment or order." *Id.* at 1293.

PPS relies heavily on a decision by the Middle District of Alabama, *Thurman v. Judicial Correction Services*, M.D. Ala. 2017 WL 4079039, at *5–8 (M.D. Ala., Sept. 13, 2017), in which the court found that the *Rooker-Feldman* doctrine barred claims arising from a private probation scheme similar to this one. But in that case the plaintiffs expressly sought to void the Municipal Court's orders of probation. *See id.* at *1 (describing plaintiff's claims to assert that the defendants "violated state and federal law by commanding probationers to pay fines and fees pursuant to documents that *were not lawful orders of probation*" and that the defendants "were unjustly enriched by their collection of fees *without legal authority*") (emphases added). By contrast, in this case, Plaintiffs do not contest

the validity of the Municipal Court's orders of probation; they challenge only the administration of those orders.

The court can determine whether PPS violated due process without addressing the legality of the Municipal Court's probation orders. Accordingly, the due process claim against PPS is not inextricably intertwined with the probation orders, and the *Rooker-Feldman* doctrine does not divest this court of jurisdiction over the claim.

2. Merits

PPS also moves, under Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint for failure to state a claim. A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. "To survive a motion to dismiss, the plaintiff must plead 'a claim to relief that is plausible on its face.'" *Butler*, 685 F.3d at 1265 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A. *Count One (Due Process Claim)*

In Count One, Plaintiffs assert that PPS violated due process because its financial conflict of interest

> incentivized [it] to maximize corporate profit in deciding probation
> conditions for Plaintiffs and members of the proposed Damages Class;

how to enforce the conditions, what information to provide Plaintiffs and members of the proposed Damages Class about their rights and obligations while on probation; which statements to submit to the Municipal Court about the probation compliance of the members of the proposed Class; and what sanctions to recommend to the Municipal Court for alleged probation violations.

(Doc. 56 at 65).

42 U.S.C. § 1983 provides the vehicle for a plaintiff to assert a claim of the deprivation of a federal right against a person acting under color of state law. *Cf. GeorgiaCarry.Org v. Georgia*, 687 F.3d 1244, 1254 n.15 (11th Cir. 2012) ("Where a statute provides an adequate remedy, [the court] will not imply a judicially created cause of action directly under the Constitution."). Although PPS is a private company, Plaintiffs assert that it acted under color of state law because it performed functions typically reserved for the State. (Doc. 91 at 7–8). PPS does not argue that it was not a state actor, so the court will accept Plaintiffs' assertion. That leaves the question whether the facts alleged by Plaintiffs establish a deprivation of a federal right: the right to due process provided by the Fourteenth Amendment the U.S. Constitution.

The Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A procedural due process claim "requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Arrington v.*

*Helms*, 438 F.3d 1336, 1347 (11th Cir. 2006). "In addition, section 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986). Finally, "the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994).

"[A] fair trial in a fair tribunal is a basic requirement of due process." *Caperton v. A.T. Masse Coal Co.*, 556 U.S. 868, 876 (2009) (quotation marks omitted). One ingredient of a fair trial in a fair tribunal is a disinterested adjudicator and prosecutor. *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807–09 (1987); *Connally v. Georgia*, 429 U.S. 245, 250 (1977); *Ward v. Village of Monroeville*, 409 U.S. 57, 59 (1972); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). An adjudicator or prosecutor's financial conflict interest violates due process. *See Young*, 481 U.S. at 807–09.

Assuming, for the moment, that PPS owed a duty of neutrality as Plaintiffs argue, they have alleged facts that, if true, would establish a financial conflict of interest on PPS's part. *See Marshall*, 446 U.S. at 249–50 ("A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring

irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions."). In a criminal case or in a civil case seeking injunctive or declaratory relief, a financial conflict of interest alone can support the relief sought by the party who experienced the violation. But in a case seeking damages, the plaintiff must establish not only that a violation of due process occurred, but that the defendant was responsible for that violation. *See Zatler*, 802 F.2d at 401.

None of the cases Plaintiffs cited in support of the proposition that a conflict of interest violates due process involved a civil suit for damages. (*See* Doc. 60 at 10–12; Doc. 91 at 4–5); *see Young*, 481 U.S. at 789–90 (appeal of a criminal conviction); *Marshall*, 446 U.S. at 241 (stating that the plaintiffs had brought suit seeking declaratory and injunctive relief against the allegedly unconstitutional civil penalty provisions of the Fair Labor Standards Act); *Ward*, 409 U.S. at 57–58 (appeal of a criminal conviction); *Tumey*, 273 U.S. at 514–15 (appeal of a criminal conviction). To the contrary, in a civil suit for damages, the plaintiff must establish causation. *Zatler*, 802 F.2d at 401.

Plaintiffs have not adequately alleged facts showing that PPS's financial conflict of interest caused their injuries. Most of their allegations establish that, if a violation of due process occurred, the Municipal Court was responsible because that Court, not PPS, wielded all adjudicatory authority.

Plaintiffs assert in Count One that PPS "decid[ed] probation conditions for Plaintiffs," but the second amended complaint does not sufficiently allege that PPS actually decided their probation conditions. As to Ms. Harper and Ms. Jones, the second amended complaint alleges that the Municipal Court left conditions of probation blank on their orders of probation, but it does not allege that PPS later filled out additional conditions. (Doc. 56 at 33, 45–46). And even if PPS had added conditions in the probation orders or the Sentence of Probation forms, a Municipal Court judge signed those documents. (*See id.* at 15).

As to Ms. Essig, the second amended complaint does allege that PPS "checked off other probation conditions on [the Sentence of Probation] form," but it does not state what those conditions were or how the imposition of those conditions deprived her of liberty or property. (*See id.* at 54). In short, that allegation is too conclusory to support a claim for denial of due process. *See Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017) ("Conclusory allegations and legal conclusions are not sufficient; the plaintiff must state a claim to relief that is plausible on its face.") (alteration and quotation marks omitted).

Furthermore, Plaintiffs assert that that "[g]enerally, PPS specified on the [Sentence of Probation] Form that persons such as Plaintiffs must abstain from the use of alcohol or drugs and submit to random testing and not drive without a valid driver's license. By contrast, the Probation Order did not specify these

conditions." (Doc. 56 at 16). This allegation is too vague to state a claim for a violation of due process; even taken in the light most favorable to Plaintiffs, the court cannot accept allegations about what PPS "generally" did to probationers "such as" these named Plaintiffs. And, even if Plaintiffs had alleged that PPS filled out the Sentence of Probation forms with conditions not specified in the probation orders, a Municipal Court judge signed the Sentence of Probation forms. (*See id.* at 15).

Next, Plaintiffs allege that PPS's conflict of interest affected the type of information it provided to probationers about their rights as well as the type of information and recommendations it provided to the Municipal Court about the probationers it supervised. (Doc. 56 at 65). But Plaintiffs have not established how PPS's provision of information—or, for that matter, failure to provide information—*caused* a deprivation of a liberty or property right. Again, even assuming that the failure to make an indigency determination or find alternative methods for Plaintiffs to satisfy the fines and court costs was a deprivation of a liberty or property right, the responsibility for that deprivation rested with the Municipal Court, not PPS. (*See* Doc. 56-1 at 9 ("Those offenders the Court shall determine as indigent shall be ordered as such and supervised at no cost.")). Likewise, the Municipal Court bore the responsibility for determining whether Plaintiffs had violated the terms of their probation and imposing sanctions for any

such violation. Regardless of what PPS recommended, only the Municipal Court had the power to order Plaintiffs to serve jail time for failure to comply with the terms of their probation.

In short, if PPS determined—rightly or wrongly—that the probationers had failed to comply with the terms of their probation, PPS would report that determination to the Municipal Court, which would hold a hearing and determine whether to sanction the probationer for the alleged violation. If the Court blindly accepted PPS's reports and recommendations, the Court, not PPS, caused the probationers' injury. *See Zatler*, 802 F.2d at 401. Plaintiffs have not alleged facts that would establish PPS's liability for making any adjudicatory or prosecutorial decisions.

Plaintiffs do make three specific factual allegations about PPS's actions against each named Plaintiff. First, Plaintiffs allege that, although Ms. Harper's probation order and Sentence of Probation form stated that she would serve twelve months on probation, "[s]omeone" altered her Sentence of Probation form to provide that she would serve a term of twenty-four months' probation. (Doc. 56 at 33–34). Second, Plaintiffs allege that PPS continued to charge Ms. Jones for the interlock device even after she had received permission to sell her car and stop paying for the device. (*Id.* at 50). And third, Plaintiffs allege that PPS increased

Ms. Essig's fine by $100 on a receipt it provided at a supervision appointment. (*See id.* at 56).

These specific allegations against PPS fail to state a due process claim because the State provides an adequate post-deprivation remedy. *See McKinney*, 20 F.3d at 1557. First, the Municipal Court held periodic review hearings, at which Plaintiffs could have complained about any alterations. And even if the review hearings were not a sufficient post-deprivation remedy, Alabama law provides another post-deprivation remedy in the form of its tort law, which the Eleventh Circuit has held can provide an adequate post-deprivation remedy that precludes a due process claim. *Lindsey v. Storey*, 936 F.2d 554, 561 (11th Cir. 1991); *see also Rittenhouse v. DeKalb Cty.*, 764 F.2d 1451, 1459 (11th Cir. 1985) (holding that even if the State provides immunity to state actors, such immunity does not make a state post-deprivation remedy inadequate).

Alabama law provides several torts to which Plaintiffs could have resorted, including the tort they assert in Count Two: abuse of process. *See* (Doc. 56 at 66); *C.C. & J., Inc. v. Hagood*, 711 So. 2d 947, 950 (Ala. 1998) (setting out the elements of an abuse of process claim). And if no other tort existed, Alabama law provides a cause of action for unjust enrichment, which provides a plaintiff an equitable remedy when "the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to

defendant because of mistake or fraud." *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006) (emphases and quotation marks omitted); *see also Kruse v. City of Birmingham*, 67 So. 3d 910, 915 (Ala. Civ. App. 2011) ("The retention of a benefit is 'unjust,' for purposes of an unjust enrichment claim, if the donor of the benefit acted under a mistake of fact or in misreliance on a right or duty, or the recipient of the benefit engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship.") (quotation marks omitted). Accordingly, Plaintiffs have not established that no adequate post-deprivation remedy could have cured any due process violation they suffered during their probation proceedings.

Finally, to the extent Plaintiffs seek to assert a claim that PPS's conduct violates their substantive due process rights, the court concludes that they have failed to adequately state a claim. "[C]onduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003). "Even intentional wrongs seldom violate the Due Process Clause, and only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013) (quotation marks and citation omitted). "[T]he Fourteenth Amendment must not be used through section 1983 as

a 'font of tort law' to convert state tort claims into federal causes of action." *Waddell*, 329 F.3d at 1305.

Plaintiffs cannot state a claim that PPS charging $40 per month violated their substantive due process rights because Alabama law requires probationers with income "to contribute forty dollars ($40) per month toward the cost of his or her supervision and rehabilitation." Ala. Code § 15-22-2(a)(1). And, although the other allegations against PPS and the Municipal Court are troubling, they do not rise to the level of shocking the conscience. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). At most, Plaintiffs have alleged that PPS committed torts against them, but the commission of torts alone does not establish a violation of substantive due process.

The court concludes that Plaintiffs have not stated a claim for denial of due process. Accordingly, the court **GRANTS** the motion to dismiss Count One and **DISMISSES WITH PREJUDICE** the due process claim.

### B.     *Count Two (Abuse of Process Claim)*

In Count Two, Plaintiffs allege that PPS abused the process of probation "by misusing the Probation Order and Sentence of Probation Form granting them authority to supervise probation to extort money from Plaintiffs for PPS's own

23

profit." (Doc. 56 at 66). Specifically, Plaintiffs argue that instead of providing probation services to Plaintiffs, PPS "unilaterally chang[ed] or add[ed] conditions" in order to garner more profit, (Doc. 60 at 15–16), as demonstrated by PPS lengthening Ms. Harper's probation period, improperly charging Ms. Jones for an interlock device she was not using, and increasing Ms. Essig's fine, (*see* doc. 56 at 27–28, 34, 50, 56).

PPS contends that Plaintiffs have failed to state an abuse of process claim because jail time was a valid repercussion for violating the terms of their probation, and truthfully telling probationers about that potential consequence does not amount to an abuse of process. (Doc. 58 at 15). In addition, PPS argues, it was entitled to collect those fees because its contract with the Municipal Court permitted it to do so. (*Id.* at 16). Finally, PPS asserts that it was under no legal obligation to evaluate indigency or determine proper sentencing, so it cannot have abused process by failing to do those things. (*Id.*).

Under Alabama law, an abuse of process claim requires "1) the existence of an ulterior purpose, 2) a wrongful use of process, and 3) malice." *C.C. & J., Inc. v. Hagood*, 711 So. 2d 947, 950 (Ala. 1998). "[T]he [ulterior motive] must culminate in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect . . . ." *Dempsey v. Denman*, 442 So. 2d 63, 65 (Ala. 1983) (alterations in original). "Wrongful use of process"

means the defendant "somehow acted outside the boundaries of legitimate procedure" after the process was issued. *Hagood*, 711 So. 2d at 951 ("[T]here is no liability where the defendant has done nothing other than carry out the process to its authorized conclusion, even though with bad intentions.") (quotation marks omitted) (alteration in original). And "[o]nce the plaintiff establishes an ulterior purpose and a wrongful use of process, 'malice is made to appear in the eyes of the law.'" *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015, 1026 (Ala. Civ. App. 1999) (quoting *Clikos v. Long*, 165 So. 394, 397 (Ala. 1936)).

Plaintiffs contend that the true purpose of probation is "to ameliorate the harshness of the law's judgment and give the convict a chance to show that he or she is a fit subject and may be rehabilitated and become an acceptable citizen." *Johnson v. State*, 161 So. 3d 1229, 1230 (Ala. Crim. App. 2012) (quotation marks omitted). Thus, they argue, a profit motive is an improper motive. PPS responds that its desire to profit was not improper because the contract with the Municipal Court expressly permitted it to charge monthly supervision fees.

True, the contract PPS entered with the Municipal Court permitted it to charge the monthly supervision fee. What's more, Alabama law expressly requires probationers with income "to contribute forty dollars ($40) per month toward the cost of his or her supervision and rehabilitation." Ala. Code § 15-22-2(a)(1). The court cannot conclude that the monthly supervision fee alone would establish an

improper motive under Alabama law. But Plaintiffs allege facts beyond the requirement that they pay the monthly fee; they allege that PPS lengthened Ms. Harper's probation period, improperly charged Ms. Jones for an interlock device she was not using, and increased Ms. Essig's fine. (*See* Doc. 56 at 27–28, 34, 50, 56). They also allege that PPS misrepresented Ms. Harper's and Ms. Essig's compliance with the terms of their probation. (*Id.* at 40, 56–57).

PPS does not address those allegations. And unlike the due process claims, the Municipal Court's failure to exercise appropriate oversight does not appear to relieve PPS of liability. The court concludes that, at this stage, Plaintiffs have plausibly alleged that PPS had an ulterior purpose (profit) and that it used the process of probation to "obtain a result which the process was not intended by law to effect . . . ." *Dempsey*, 442 So. 2d at 65. The allegation PPS altered the terms of their probation for the purpose of increasing its profit makes their claim of abuse of process plausible. Accordingly, the court **DENIES** the motion to dismiss Count Two for failure to state a claim.

Because the court is dismissing the only federal claim in this case, the court must re-examine its subject matter jurisdiction over the state law claim. Until now, the court has exercised supplemental jurisdiction over the state law claim. *See* 28 U.S.C. § 1367(a). But the court has now "dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). And the remaining state law claim does

not involve any question of federal law. *See Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997) ("State courts, not federal courts, should be the final arbiters of state law."). Moreover, this case is still at an early stage, when the Eleventh Circuit has encouraged courts not to exercise supplemental jurisdiction over state law claims. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").

Plaintiffs have asserted that the court has diversity jurisdiction. (Doc. 91 at 11). But the second amended complaint does not properly allege the citizenship of any party. (*See* Doc. 56 at 7); 28 U.S.C. § 1332(c)(1) (providing that a corporation is a citizenship of each State in which it was incorporated and the State where it has its principal place of business); *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013) (holding that "[r]esidence alone is not enough" to determine an individual's citizenship for diversity purposes). Nor does the second amended complaint allege or establish that the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a). Plaintiffs have requested to amend the complaint to rectify those omissions. (*See* Doc. 91 at 11). The court does not believe amendment is necessary; instead, the court **DIRECTS** Plaintiffs to **SHOW CAUSE** why the court should not dismiss the state law claim for lack of jurisdiction.

### III.    CONCLUSION

The court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss the second amended complaint.  The court **DISMISSES** Count One **WITH PREJUDICE**.  The court **DENIES** the motion to dismiss Count Two.

The court **DIRECTS** Plaintiffs to **SHOW CAUSE**, in writing, **on or before November 28, 2018**, why the court should not dismiss the state law claim for lack of jurisdiction.

**DONE** and **ORDERED** this November 14, 2018.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE