IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CATHERINE REGINA HARPER, ]<br>on behalf of herself and those similarly ]<br>situated, et al., ]<br> ]<br>    Plaintiffs, ]<br> ]<br>v. ]<br> ]<br>PROFESSIONAL PROBATION ]<br>SERVICES, INC., et al., ]<br> ]<br>    Defendants. ] | | 2:17-cv-01791-ACA |

## **MEMORANDUM OPINION**

This matter comes before the court on Defendant Professional Probation Services, Inc.'s ("PPS") motion to dismiss the second amended complaint. (Doc. 57).

In this case, PPS contracted with the Municipal Court of the City of Gardendale, Alabama, to perform probation supervision for the Municipal Court. Under the contract, neither the Municipal Court nor Gardendale had to pay PPS for its services because PPS charged offenders who had been sentenced to probation monthly service fees. Three of those probationers—Catherine Harper, Shannon Jones, and Jennifer Essig—brought this lawsuit, alleging that PPS violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution because it had a financial conflict of interest in the probation cases assigned to it,

and that PPS violated Alabama law by abusing the process of probation to extort money from the probationers it supervised. Ms. Harper and Ms. Jones bring their claims individually and on behalf of a putative class, and Ms. Essig brings her claims individually.

PPS moved to dismiss the second amended complaint. (Doc. 57). The court previously granted in part and denied in part the motion, finding that although the court had subject matter jurisdiction over the federal due process claim raised in Count One, Plaintiffs Catherine Harper, Shannon Jones, and Jennifer Essig had not stated a claim in that count. (Doc. 92). The court did, however, find that Plaintiffs had stated a state law abuse of process claim in Count Two. (*Id.*). The court later reconsidered and vacated the dismissal order as to only the merits of Count One; the reconsideration order did not vacate the determination that the court has subject matter jurisdiction over that claim or that Count Two stated a claim. (Doc. 101).

After further briefing (docs. 103, 104, 107), the motion to dismiss the second amended complaint is again under submission. The court **WILL GRANT** the motion and **WILL DISMISS** Count One **WITH PREJUDICE** because, even accepting as true all of Plaintiffs' factual allegations, as a matter of law they have not stated a claim that PPS violated their due process rights. Furthermore, having dismissed the only federal cause of action, the court **DECLINES** to exercise

supplemental jurisdiction over the state law claim asserted in Count Two and **WILL DISMISS** that claim **WITHOUT PREJUDICE**.

I. BACKGROUND

At this stage, the court must accept as true the factual allegations in the complaint and construe them in the light most favorable to the plaintiff. *Butler v. Sheriff of Palm Beach Cty.*, 685 F.3d 1261, 1265 (11th Cir. 2012). The court may also consider exhibits attached to the complaint. *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). Plaintiffs attach to their second amended complaint PPS's contract with the Municipal Court. (*See* Doc. 56-1). As a result, the court's description of the facts incorporates not only Plaintiffs' allegations but the content of the contract.

PPS is a for-profit corporation that supervises probationers. (Doc. 56 at 8). Gardendale's Municipal Court hears cases involving city ordinance violations, including traffic tickets and misdemeanors. (*Id.* at 7–8). In 1998, a judge of the Municipal Court and PPS entered a contract under which PPS agreed to serve as the Municipal Court's sole probation provider. (*Id.* at 8–9; Doc. 56-1). Under the contract, PPS did not charge Gardendale for its services because probationers paid monthly fees to PPS to cover the costs of supervision and any additional services, such as anger management or substance abuse classes. (Doc. 56 at 10–11). The contract permitted PPS to charge probationers $30 per month for basic probation

services. (Doc. 56-1 at 9). In practice, PPS charged offenders a $40 monthly supervision fee. (Doc. 56 at 15).

In a typical case, the Municipal Court would order an offender to pay a fine or court cost and, if the offender could not immediately pay the entire amount owed, the Court would automatically issue a probation order assigning the offender to probation. (Doc. 56 at 11). A standard probation order would list the length of probation, the type of supervision, and any special conditions, such as completion of vocational rehabilitation. (*See id.* at 14). The probation order would not state the amount of any fine or court costs. (*See id.*).

After the Municipal Court issued the probation order, the offender would meet with a PPS employee in a different room within the courthouse. (Doc. 56 at 15). The Municipal Court judge would have pre-signed a "Sentence of Probation" form, and the PPS employee would complete the form during the first meeting with the new probationer. (*Id.*). The Sentence of Probation form indicated the total fine and court costs owed, the monthly service fee of $40, the length of probation, and any additional conditions. (*See id.* at 15–16). The Municipal Court judge would not review the Sentence of Probation form after PPS filled it out. (*Id.* at 16).

After filling out the Sentence of Probation form, the PPS employee would complete a PPS Enrollment Form, which listed the name of the probationer's probation officer, the date of her first appointment at PPS, the amount due at that

appointment, and instructions for the probationer, including how and by when probationers could reschedule appointments. (Doc. 56 at 17–19).

The contract between PPS and the Municipal Court indicates that the Municipal Court would make any indigency determinations. (*See* Doc. 56-1 at 9) ("Those offenders the Court shall determine as indigent shall be ordered as such and supervised at no cost."). But in practice, the Municipal Court did not assess indigency and PPS did not evaluate probationers for indigency or assist them in obtaining an indigency determination from the Municipal Court. (Doc. 56 at 11–12, 20).

At probation review hearings, the probation officer would appear at the Municipal Court with the probationer. (Doc. 56 at 28–29). PPS would report offenders' alleged non-compliance with the probation conditions to the Municipal Court without filing a contempt citation or revocation paperwork, and it would not provide probationers with any information about the alleged violations. (*Id.* at 29). When offenders had their probation revoked and spent time in jail, they did not receive any credit toward the fine or court costs. (*Id.* at 31). And when offenders could pay only a part of the amount due monthly, PPS took its $40 fee out of that amount before applying any of the payment to the probationer's fine or court costs. (*Id.* at 23). Finally, PPS never offered any additional services, such as substance abuse treatment or anger management classes, to probationers. (*Id.* at 24). Instead,

PPS simply required probationers to appear for in-person appointments to make a payment and receive the next appointment date. (*Id.*).

On November 1, 2017, a Municipal Court judge ordered all probationers supervised by PPS to stop reporting to PPS, to stop making payments to PPS, and to either pay the Municipal Court all outstanding court debt or appear in court to request a payment plan. (Doc. 56 at 9–10). After the Municipal Court entered that order, PPS terminated its contract with the Court. (*Id.* at 10). PPS no longer operates in Gardendale. (*Id.*).

Against that background, the court will describe the factual allegations particular to Ms. Harper, Ms. Jones, and Ms. Essig, all offenders whom the Municipal Court sentenced to probation under PPS. (*Id.* at 32, 45, 53).

1. Gina Harper

In February 2017, Ms. Harper pleaded guilty to driving on a revoked license, and the Municipal Court imposed a $500 fine, $215 in court costs, a sentence of 48 hours of jail to serve, and one year's probation. (Doc. 56 at 32–33). A PPS employee informed Ms. Harper that she would have to pay PPS $80 per month, of which $40 was the monthly supervision fee. (*Id.*). Ms. Harper's Sentence of Probation form changed her period of probation from twelve months to twenty-four months. (*Id.* at 34).

Over the next eight months, Ms. Harper repeatedly told her probation officer that she could not afford to pay $80 per month and asked about performing community service instead. (Doc. 56 at 34–36, 39–41). Her probation officer told her to discuss community service with the Municipal Court, but when she asked the Municipal Court, the judge told her and her probation officer that PPS, not the Court, had to order community service. (*Id.* at 38–39). The same probation officer later told Ms. Harper that PPS could not give her community service unless the Municipal Court ordered it. (*Id.* at 39). When Ms. Harper continued to ask about community service, the probation officer told her that she could not complete community service because she worked a full-time job, and community service could be performed on only weekdays. (*Id.* at 41).

Over the period during which PPS supervised Ms. Harper's probation, she never made a full payment, typically paying nothing or between $20 and $30. (Doc. 56 at 35–44). By the time the Municipal Court ordered all probationers to stop reporting to PPS, she had paid $90 total, all of which went toward PPS's monthly fees, and none of which had been applied to her fine or court costs. (*Id.* at 44).

Ms. Harper also missed a number of appointments, but she alleges that she almost always called to reschedule before the scheduled appointment. (Doc. 56 at 36–43). The only time she missed an appointment without rescheduling it beforehand was when PPS failed to notify her of the appointment. (*Id.* at 41).

7

In September 2017, Ms. Harper's probation officer reported to the Municipal Court that Ms. Harper had missed appointments and was non-compliant with the terms of her probation. (Doc. 56 at 40). Ms. Harper asked for a list of the appointments she had missed but received no answer. (*Id.*). She asserts that the probation officer was counting appointments that she had rescheduled pursuant to the instructions given by PPS to probationers. (*Id.* at 42). Based on the probation officer's representations that Ms. Harper was non-compliant, the Municipal Court ordered her to jail for five days. (*Id.* at 40–41).

2. Shannon Jones

On August 19, 2016, Plaintiff Shannon Jones pleaded guilty to driving with a suspended license, two charges of driving under the influence, and driving without insurance. (Doc. 56 at 45). The Municipal Court orally sentenced her to 60 days in jail and various fines and court costs, but the actual probation order that PPS gave Ms. Jones after the hearing stated that she had a suspended jail sentence of 30 days and probation for one year, and that she would have to "pay fine [sic], court costs, restitution, fees." (*Id.* at 46). Neither the oral sentence nor the probation order indicated the total amount Ms. Jones owed. (*Id.* at 45–46).

After the hearing, Ms. Jones met with a PPS employee who gave her a Sentence of Probation form, which, in contrast to the oral sentence and probation order, stated that Ms. Jones was sentenced to 240 days in jail (instead of 30 or 60

days), two years' probation (instead of one year), and $9,440 in fines and court costs. (Doc. 56 at 46). The form informed Ms. Jones that she would have to pay PPS $445 per month, made up of $370 for the fines and court costs and $75 monthly for an interlock device. (*Id.*). She would also have to pay the monthly service fee of $40. (*Id.*). Accordingly, the total amount Ms. Jones owed PPS each month was $485.[1] (*See id.*). The Sentence of Probation form contained the municipal judge's signature.

At her first court review hearing, Ms. Jones requested a reduction in her monthly fees and asked how she could be declared indigent. (Doc. 56 at 47–48). The Municipal Court told her that it could not reduce her monthly payments and that PPS had to consider and process her request for an indigency determination. (*Id.*).

At another court review hearing, Ms. Jones received permission to remove the interlock device so that she could sell her car. (Doc. 56 at 49–50). PPS told her that her monthly payment would drop to $370 because she no longer had to pay the $75 for the interlock device. (*Id.* at 50). But after one month of the reduced payment, her monthly payment went back up to $445, of which $40 went toward PPS's monthly fees.[2] (*Id.* at 50).

---

[1] The court notes that $9,440 divided by 24 months equals $393.33 per month, not $370. Adding the $75 interlock fee and the $40 service fee would bring the monthly total to $508, not $485. Because it does not affect the disposition of the motion to dismiss, the court need not resolve the discrepancy.

[2] In another mathematical discrepancy, the second amended complaint alleges that, after Ms. Jones sold her car and PPS was supposed to stop charging her for the interlock device, it continued to require her to pay $445, of which $40 went toward its monthly service fees. (Doc. 56 at 50). But the second amended complaint had alleged that Ms. Jones originally owed $485—

9

Once PPS terminated its contact with Gardendale, the Municipal Court lowered Ms. Jones' monthly fees based on her income, and she now pays $50 per month. (Doc. 56 at 53). As of the filing of the second amended complaint, Ms. Jones had paid over $9,000, of which $520 went to PPS's fees. (*Id.*). She still owes $4,195 in fines and court costs. (*Id.*).

3.  Jennifer Essig

On July 21, 2017, Plaintiff Jennifer Essig pleaded guilty to trespassing. (Doc. 56 at 53). The Municipal Court imposed a $50 fine and $232 in court costs. (*Id.*). At her first probation appointment, Ms. Essig received a receipt showing an additional $100 in court fines. (*Id.* at 27–28, 56). The receipt provided no explanation for the increase. (*Id.*).

Although Ms. Essig owed at least $80 per month, she frequently paid under $30. (*Id.* at 55–56). At a review hearing, her probation officer informed the Municipal Court that she had missed appointments. (*Id.* at 56–57). The Municipal Court sentenced her to 24 hours' jail time. (*Id.* at 57).

Ms. Essig paid off her balance by October 3, 2017. (*Id.* at 57).

---

not $445—of which $40 would go toward PPS's monthly fees. (*See id.* at 46). Again, although the court notes the discrepancy, the court need not reconcile these numbers because the motion to dismiss does not depend on them.

4. The Lawsuit

Plaintiffs filed their initial complaint in October 2017, naming PPS, the City of Gardendale, and Municipal Court Judge Kenneth Gomany. (Doc. 1). They filed an amended complaint against the same defendants in December 2017. (Doc. 33). In March 2018, the court dismissed the claims against Gardendale and Judge Gomany. (Doc. 49). Plaintiffs then filed a second amended complaint alleging that PPS: (1) violated the Due Process Clause of the Fourteenth Amendment; and (2) abused the process of probation, in violation of Alabama law. (Doc. 56 at 64–67).

## II. DISCUSSION

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. "To survive a motion to dismiss, the plaintiff must plead 'a claim to relief that is plausible on its face.'" *Butler*, 685 F.3d at 1265 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

1. Adequacy of Count One

Given the procedural history of this case recited above, the only substantive issue left for the court to address is whether Count One fails to state a federal claim.

(Doc. 58 at 9–14; Doc. 103). In Count One, Plaintiffs assert that PPS violated due process because its financial conflict of interest

> incentivized [it] to maximize corporate profit in deciding probation conditions for Plaintiffs and members of the proposed Damages Class; how to enforce the conditions, what information to provide Plaintiffs and members of the proposed Damages Class about their rights and obligations while on probation; which statements to submit to the Municipal Court about the probation compliance of the members of the proposed Class; and what sanctions to recommend to the Municipal Court for alleged probation violations.

(Doc. 56 at 65). In their briefing on the motion to dismiss, Plaintiffs explain that PPS deprived them of liberty and property by setting frequent appointments, causing them to travel more frequently and incur transportation costs and lost wages; failing to give notice about alleged violations before review hearings, lying about Plaintiffs' compliance with probation terms and failing to provide specific testimony about the alleged violations to the Municipal Court; altering the conditions set by the Municipal Court and charging a monthly supervision fee that neither state law nor the contract with the Municipal Court authorized; and withholding indigency determinations. (Doc. 104 at 10–13).

42 U.S.C. § 1983 provides the vehicle for a plaintiff to assert a claim of the deprivation of a federal right against a person acting under color of state law. *Cf. GeorgiaCarry.Org v. Georgia*, 687 F.3d 1244, 1254 n.15 (11th Cir. 2012) ("Where a statute provides an adequate remedy, [the court] will not imply a judicially created cause of action directly under the Constitution."). The parties do not dispute that

12

PPS qualifies as a person acting under color of state law. That leaves the question whether the facts alleged by Plaintiffs establish that PPS deprived them of a federal right: the right to due process provided by the Fourteenth Amendment the U.S. Constitution.

The Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A procedural due process claim "requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Arrington v. Helms*, 438 F.3d 1336, 1347 (11th Cir. 2006).

In a criminal case, "a fair trial in a fair tribunal is a basic requirement of due process." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quotation marks omitted). One ingredient of a fair trial in a fair tribunal is a disinterested decisionmaker. *Connally v. Georgia*, 429 U.S. 245, 250 (1977); *Ward v. Village of Monroeville*, 409 U.S. 57, 59 (1972); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).

Plaintiffs' first argument in support of Count One is that PPS was a decisionmaker because it performed adjudicatory functions. (Doc. 104 at 6; Doc. 3-1 at 14). They cite to several cases that state that probation or parole officers may perform adjudicatory functions (*see* doc. 60 at 11 n.4), but whether probation officers *may* perform adjudicatory functions is irrelevant if they did not actually

13

perform those functions. And in this case, Plaintiffs have not alleged any facts showing that PPS or its employees actually performed adjudicatory functions; at every step, the Municipal Court signed off on PPS's actions before PPS even took them.

Regardless of the Municipal Court's relinquishment of its responsibilities, the fact remains that the Court—not PPS—performed all adjudicatory functions in this case. The Municipal Court may have pre-signed the Sentence of Probation form (*see* doc. 56 at 15), refused to make indigency determinations (*id.* at 11–12, 20), and accepted probation officers' misrepresentations about probationers without question or investigation (*id.* at 40–41, 56–57), but all of those adjudicative functions were still performed by the Court, not by PPS. Plaintiffs have not alleged facts showing that PPS acted as an adjudicator in this case; accordingly, it was not a decisionmaker.

Plaintiffs next argue that, like the Municipal Court, PPS owed them a duty of neutrality even in the exercise of its non-adjudicatory functions, such that the existence of a financial stake in the administration of probation violated the Due Process Clause. (*See* Doc. 104 at 5–7). Plaintiffs, however, have not cited to any authority holding that probation officers (or, for that matter, a private probation company) performing non-adjudicatory functions owe a duty of neutrality to probationers.

Plaintiffs state that the Due Process Clause's neutrality requirement reaches beyond judges to "those with purely enforcement roles." (*Id.* at 5) (citing *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 250 (1980). But there is no support for this argument. In fact, the decision that Plaintiffs cite in support of their argument contradicts that argument. In *Marshall*, the Supreme Court wrote:

> Prosecutors need not be entirely "neutral and detached," *cf. Ward v. Village of Monroeville*, 409 U.S., at 62. In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law. The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties. The distinction between judicial and nonjudicial officers was explicitly made in *Tumey*, 273 U.S., at 535, where the Court noted that a state legislature "may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people."

*Marshall*, 446 U.S. at 248–49 (citations altered).

Plaintiffs attempt to shore up their assertion that the Due Process Clause "requires neutrality of the actors in the judicial proceeding" (doc. 104 at 5) by citing *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807–09 (1987), *Brotherhood of Locomotive Firemen & Enginemen v. United States*, 411 F.2d 312, 319 (5th Cir. 1969) ("*BLFE*"), and *United States ex rel. S.E.C. v. Carter*, 907 F.2d 484, 486 n.1 (5th Cir. 1990). But even those cases do not support their argument that probation officers owe the same duty of neutrality as judges.

In *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 790 (1987), the Supreme Court held only that "counsel for a party that is the beneficiary of a court order may not be appointed to undertake contempt prosecutions for alleged violations of that order." Contrary to Plaintiffs' contention, the *Young* decision is not about due process. Although the Court discussed the need for a disinterested prosecutor, it did not hold that the lack of a disinterested prosecutor is a *due process* violation. *See id.* at 807–09.

As for the *BLFE* and *Carter* cases, the court notes as an initial matter that although the former Fifth Circuit's decision in *BLFE* binds this court, the Fifth Circuit's decision in *Carter* does not. Moreover, to the extent the *BLFE* and *Carter* decisions purported to hold that only government attorneys could act as prosecutors in criminal contempt cases, the Supreme Court's *Young* decision overruled those holdings. *See Young*, 481 U.S. at 793. And those cases are distinguishable from this case because they involved the prosecution of a crime—criminal contempt of court by a court appointed attorney who already represented the underlying, prevailing party.

Plaintiffs cite no other law supporting their argument that probation officers owe a duty of neutrality to probations, and this court has been unable to find any such law. Therefore, the court cannot conclude that PPS's financial interest in the

16

administration of probation violated the duty of neutrality. Accordingly, Plaintiffs cannot state a due process claim against PPS, and this court must dismiss Count One.

### 2. Supplemental Jurisdiction Over Count Two

The only other claim remaining in this case is Count Two, a state law claim for abuse of process. (Doc. 56 at 66). Plaintiffs concede that the court lacks diversity jurisdiction over Count Two. (Doc. 102). While Count One remained in the case, the court had exercised supplemental jurisdiction over Count Two. *See* 28 U.S.C. § 1367(a). But the court has now "dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). And the remaining state law claim does not involve any question of federal law. *See Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997) ("State courts, not federal courts, should be the final arbiters of state law."). Moreover, this case is still at an early stage, when the Eleventh Circuit has encouraged courts not to exercise supplemental jurisdiction over state law claims. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."). Accordingly, the court **DECLINES** to exercise supplemental jurisdiction over Count Two, and **WILL DISMISS** that claim as well.

## III. CONCLUSION

The court **WILL GRANT** PPS's motion to dismiss and **WILL DISMISS** Count One **WITH PREJUDICE**. The court **DECLINES** to exercise supplemental jurisdiction over Count Two and **WILL DISMISS** Count Two **WITHOUT PREJUDICE**. The court reminds the parties that, as relevant to Count Two, "[t]he period of limitations for any claim asserted under subsection (a) [of 28 U.S.C. § 1367] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d).

The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this August 5, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE